519 F.2d 1236
 90 L.R.R.M. (BNA) 2539, 77 Lab.Cas. P 11,093
 UNITED STATES STEEL CORPORATION, Plaintiff-Appellee,
v.
UNITED MINE WORKERS OF AMERICA et al., Defendants-Appellants,
District 20, United Mine Workers of America, and Local 892,
United MineWorkers of America, Defendants-Appellants.
 No. 74-2610.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 24, 1975.
 
 William E. Mitch, Birmingham, Ala., Jack Drake, Tuscaloosa, Ala., Harrison Combs, Joseph A. Yablonski, Washington, D. C., for defendants-appellants.
 M. L. Taliaferro, C. V. Stelzenmuller, Birmingham, Ala., for plaintiff-appellee.
 Appeals from the United States District Court for the Northern District of Alabama.
 Before BROWN, Chief Judge, and WISDOM and COLEMAN, Circuit Judges.
 WISDOM, Circuit Judge:
 
 
 1
 This appeal is from the issuance of a prospective Boys Markets[1] injunction and the later adjudication that United Mine Workers' District 20 and UMW Local 8982 were in civil contempt of the injunctive order. For some time before the issuance of the injunction in question there had been a long series of strikes over arbitrable issues. The district court, seeking to stop the steady flow of strikes, ordered the union not to strike over the current dispute or over any future dispute. The members of the local union apparently were unimpressed with the court's order. They stopped work at the Concord and Oak Groves mines in Alabama as a "memorial protest", not against United States Steel, their employer, but against the Alabama Power Company. The miners picketed that company for importing coal from South Africa. The district court found the union in civil contempt. United States Steel Corp. v. UMWA, N.D.Ala., 1974, 383 F.Supp. 1082. The union had filed its appeal of the prospective injunction before it was found in civil contempt, and now appeals both from the injunction and the contempt finding. We reverse on both issues.
 
 I.
 FACTS
 
 2
 United States Steel operates the Concord and Oak Groves mines in Alabama. The miners had walked out six times over various issues during the National Bituminous Coal Wage Agreement of 1971, up to the time of the strike that is the subject of this appeal.
 
 
 3
 In March 1972 they struck over a miner's death. The strike lasted one day. In December 1972 they struck for a day over a manning dispute. On November 12, 1973, the miners struck over the availability of rags, an issue related to safety in the mines.[2] This strike lasted for one day before it was enjoined by a temporary restraining order. This order has remained in effect by consent or perhaps because of the parties' inaction.
 
 
 4
 On April 12, 1974, a miner's death precipitated a 24-hour walkout. No judicial action was taken on this strike.
 
 
 5
 On May 9, 1974, a dispute over the filling of vacancies and seniority and transfer issues caused a strike lasting two and two-thirds days. On May 9, United States Steel made a Motion for an Order to Show Cause why the union should not be held in contempt of the temporary restraining order of November 12, 1973, issued in connection with the controversy over the rags. Alternatively, the motion asked that the order of November 12 be amended expressly to cover the May 9 strike. The district court enjoined the strike on the same day. The next day, May 10, United States Steel moved for an order to show cause and the district court issued that order immediately. A hearing on a preliminary injunction was held on May 17, 1974. On May 20 the district court issued a preliminary injunction, reading in part, as follows:
 
 
 6
 . . . defendants and each of them, their officers, agents and members and all persons acting in combination or concert with any of them, or aiding and abetting them be and each of them hereby are enjoined and restrained during the pendency of this civil action until midnight, November 11, 1974, or until further order of this Court from engaging in any strike or work stoppage at plaintiff's Concord Mine, or enlarging or extending any strike or work stoppage at Concord Mine to Oak Grove Mine over any disagreement about the interpretation or application of the collective bargaining agreement between the parties or any disagreement over any matter not mentioned in said agreement, or over local trouble of any kind, and from inducing or encouraging any of plaintiff's employees to engage in such a strike or work stoppage by word of mouth, sign, signal, vote, advice or device of any kind, or in any other manner interfering with the business of plaintiff as a means of settling any such disagreement in a manner other than set out in the collective bargaining agreement, provided that as a condition to the issuance of this preliminary injunction plaintiff is enjoined when requested by the defendants to handle any such dispute or disagreement under the grievance and arbitration provisions of the collective bargaining agreement. Provided, further, that the quitting of labor by an employee or employees in good faith because of abnormally dangerous conditions for work at the place of employment of such employee or employees will not be deemed a strike under this preliminary injunction.
 
 
 7
 The italicized language is taken word for word from the arbitration clause in the collective bargaining agreement.
 
 
 8
 On May 30 the district court amended the injunction by adding the following paragraph to the Conclusions of Law:
 
 
 9
 The Court recognizes that Boy's Markets, Inc. v. Retail Clerks Union, Local 70, 389 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), only enjoined the strike in progress at the time of the suit. However, the court in Boy's Markets also adopted the dissenting opinion in Sinclair Refining Company v. Atkinson, 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962), which set out when injunctive relief would be appropriate despite the Norris-LaGuardia Act. The Court feels that the language of the Sinclair dissent, as quoted by Boy's Markets, 398 U.S. at 253-54, 90 S.Ct. 1583, 26 L.Ed.2d at 212, is sufficiently broad to allow a prospective injunction of the type herein ordered when the tests as set out by that language are met. The Court is of the opinion that this collective bargaining agreement is so broad as to encompass any situation that could possibly arise between the parties except a good-faith walkout because of a hazard to personal safety. The Court is of the further opinion that based upon the prior practice and pattern of strikes on the part of the union, and the previous disobedience of the temporary restraining orders issued by this Court, that the only way to avoid irreparable injury to the employer in this case is to issue a prospective injunction. While this decision may seem at first glance to go further than allowed by Boy's Markets, this Court nevertheless feels that once the tests as set down by Boy's Markets are met, as is the case here, then a prohibition against future strikes is warranted, and was contemplated by the author of the Sinclair dissent (and therefore, presumably, was contemplated by the Supreme Court in Boy's Markets). Why else would the Sinclair language be quoted in Boy's Markets which requires the District Judge to consider 'whether breaches are occurring and will continue, or have been threatened and will be committed.' 398 U.S. at 253-54, 90 S.Ct. at 1594, 26 L.Ed.2d at 212.
 
 
 10
 The UMW district and local unions filed a timely notice of appeal on June 5, 1974.
 
 
 11
 On June 15, Lawson, president of the local, called E. J. Files, United States Steel's superintendent, to tell him that the union planned a protest over the importation of South African coal by the Alabama Power Company.[3] That Monday virtually all miners stayed off the job, and the union picketed Alabama Power's headquarters in Birmingham. The evidence is undisputed that there was no dispute between the employer and the miners. Predictably, United States Steel made a motion on the day of the strike to show cause why the union should not be held in contempt of the May 30 preliminary injunction. The district judge issued the order, held a hearing, and adjudicated the union in contempt.[4] He ordered the union to purge itself of contempt or pay a $12,000 fine, if 75 percent of that day's 4:00 p. m. shift did not appear at work and $4,000 for each successive shift not 75 percent manned. The mines were fully manned by the midnight shift, but the union failed to meet the condition that the 4:00 p. m. shift be three quarters manned. After a hearing on June 19, the court issued an order on June 25, finding that the union failed to purge itself of contempt. Only 45 out of 206 miners had shown up for the 4:00 p. m. shift, and the union had not attempted by telephone to notify the men to return to work. The union filed a notice of appeal on July 3, 1974.
 
 II.
 BOYS MARKETS
 
 12
 We start our analysis with the Norris-LaGuardia Act, 29 U.S.C. §§ 101-15, 1970, and the accommodation between it and Labor Management Relations Act (the Taft-Hartley Act) § 301, 29 U.S.C. § 185 (1970),[5] struck by the Supreme Court in Boys Markets v. Retail Clerks Union Local 770, 1970, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199.
 
 
 13
 The Norris-LaGuardia Act was designed to prevent federal judges from halting strikes by means of sweeping injunctions. In broad language the Act removed from federal courts jurisdiction to issue injunctions "in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute . . . from doing, whether singly or in concert, any of the following acts: (a) Ceasing or refusing to perform any work or to remain in any relation of employment . . . ". Norris-LaGuardia Act § 4(a), 29 U.S.C. § 104(a) (1970). The Act established procedural safeguards in cases when injunctions were permitted. Norris-LaGuardia Act §§ 7-9, 29 U.S.C. §§ 107-09, 1970.
 
 
 14
 In Textile Workers Union v. Lincoln Mills, 1957, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972, the Supreme Court held that § 301 of the 1947 Taft-Hartley Act authorized federal courts to fashion a body of substantive federal labor law. The Court observed that federal law favored arbitration of labor disputes.[6] An order to the employer to arbitrate was not a prohibited injunction under the Norris-LaGuardia Act, because refusal to arbitrate was not "part and parcel of the abuse against which the Act was aimed". Id at 458, 77 S.Ct. at 918. Indeed, said the court, the no-strike clause was the "quid pro quo" for the arbitration clause.Id. at 455, 77 S.Ct. 923. In 1960 the Court handed down the Steelworkers Trilogy,[7] establishing a presumption of arbitrability of disputes, and admonishing unions and employers to arbitrate even frivolous claims.[8] At that time, usually, it was the union seeking arbitration, and the employer resisting it.[9]
 
 
 15
 The "quid pro quo" rationale of Lincoln Mills was extended in Teamsters Local 174 v. Lucas Flour Company, 1962, 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593. In that case, a suit for damages for breach of contract under § 301, the Court held that the existence of an arbitration clause implied a no-strike obligation. In Sinclair Refining Company v. Atkinson, 1962, 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440, the Court held that the enforcement of arbitration clauses did not extend to injunctions against strikes in violation of no-strike obligations over arbitrable issues. Justice Brennan, in dissent, said:
 
 
 16
 (T)he enjoining of a strike over an arbitrable grievance may be indispensable to the effective enforcement of an arbitration scheme in a collective agreement; thus the power to grant that injunctive remedy may be essential to the uncrippled performance of the Court's function under Section 301.
 
 
 17
 Id. at 216-17, 82 S.Ct. at 1340.[10] Justice Brennan's dissent formed the basis for his majority opinion in Boys Markets overruling Sinclair.
 
 
 18
 In Boys Markets, the Court carefully balanced two statutorily-created[11] federal policies: (1) the prohibition against injunctions in labor disputes and (2) the policy favoring enforcement of contractually created arbitration machinery for the peaceful resolution of labor disputes. The Court said:
 
 
 19
 Our holding in the present case is a narrow one. We do not undermine the vitality of the Norris-LaGuardia Act. We deal only with the situation in which a collective bargaining contract contains a mandatory grievance adjustment or arbitration procedure. Nor does it follow from what we have said that injunctive relief is appropriate as a matter of course in every case of a strike over an arbitrable grievance. The dissenting opinion in Sinclair suggested the following principles for the guidance of the district courts in determining whether to grant injunctive relief principles that we now adopt:
 
 
 20
 A District Court entertaining an action under § 301 may not grant injunctive relief against concerted activity unless and until it decides that the case is one in which an injunction would be appropriate despite the Norris-LaGuardia Act. When a strike is sought to be enjoined because it is over a grievance which both parties are contractually bound to arbitrate, the District Court may issue no injunctive order until it first holds that the contract does have that effect; and the employer should be ordered to arbitrate, as a condition of his obtaining an injunction against the strike. Beyond this, the District Court, must, of course, consider whether issuance of an injunction would be warranted under ordinary principles of equity whether breaches are occurring and will continue, or have been threatened and will be committed; whether they have caused or will cause irreparable injury to the employer; and whether the employer will suffer more from the denial of an injunction than will the union from its issuance. 370 U.S. at 228, 82 S.Ct. at 1346.
 
 
 21
 Boys Markets, 398 U.S. at 253-54, 90 S.Ct. at 1594.
 
 
 22
 A reading of the opinion, together with the dissenting opinion in Sinclair, and academic commentary,[12] makes it clear that the purpose of Boys Markets was to vindicate the arbitral process.
 
 
 23
 An open issue after Boys Markets was whether the presumption of arbitrability enunciated in the Trilogy applied in Boys Markets injunction situations. It had been argued that application of such a presumption was tantamount to a presumption of enjoinability.[13] The Third Circuit Court of Appeals, however, read the case as providing for an exception for safety disputes. In Gateway Coal Company v. United Mine Workers, 1974, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583, the Supreme Court clarified Boys Markets by applying the presumption of arbitrability and rejecting an exception for disputes over safety.[14]
 
 
 24
 In this circuit we have had occasion to emphasize the narrowness of Boys Markets. Amstar Corp. v. Amalgamated Meat Cutters, 5 Cir. 1972, 468 F.2d 1372, 1373-74; Port of Houston Authority v. International Organization of Masters, Mates and Pilots, 5 Cir. 1971, 456 F.2d 50, 53. In Amstar we said:
 
 
 25
 Recognizing that under the doctrine of Boys Markets an injunction is permissible only if the underlying dispute 'over' which the strike has been called is arbitrable, we reverse.
 
 
 26
 In attempting to accommodate '(t)he literal terms of § 4 of the Norris-LaGuardia Act . . . to the subsequently enacted provisions of § 301(2) of the Labor Management Relations Act and the purposes of arbitration,' the Supreme Court in Boys Markets established three prerequisites to jurisdiction in a federal district court to enjoin a strike: (1) the strike must be in breach of a no-strike obligation under an effective collective agreement, (2) the strike must be 'over' an arbitrable grievance, and (3) both parties must be contractually bound to arbitrate the underlying grievance which caused the strike.
 
 
 27
 Were we to hold that the legality of the very strike sought to be enjoined in the present situation constituted a sufficiently arbitrable underlying dispute for a Boys Markets injunction to issue, it is difficult to conceive of any strike which could not be so enjoined. The Boys Markets holding was a 'narrow one', not intended to undermine the vitality of the anti-injunction provisions of the Norris-LaGuardia Act.
 
 
 28
 Amstar at 1372, 1374. See New York Tel. Co. v. CWA, 2 Cir. 1971, 445 F.2d 39, 50; Buffalo Forge Co. v. United Steelworkers, 2 Cir. May 1, 1975, 517 F.2d 1207; Emery Air Freight v. Teamsters Local 295, 2 Cir. 1971, 449 F.2d 586, 588-89; NAPA Pittsburgh, Inc. v. Automotive Employees Local 926, 3 Cir. 1974, 502 F.2d 321, 330-31 (en banc) (Hunter, J. and Seitz, C. J., dissenting); Inland Steel Co. v. UMW Local 1545, 8 Cir. 1974, 505 F.2d 293, 300-01 (Fairchild, J., dissenting).[15] With these principles in mind, we analyze the actions of the district court in this case.
 
 III.
 THE INJUNCTION
 
 29
 It is easy to understand how a district judge, exasperated by a series of strikes over arbitrable issues and by a pattern of union disobedience of injunctive orders, would feel that a prospective final injunction against strikes over arbitrable grievances and "local trouble of any kind" was the only practicable judicial solution to the problem. Here, therefore, the district judge announced from the bench that he would consider any work stoppage a violation of his order, except a good-faith walkout because of a dispute over a hazard to personal safety.[16] The state of the law, however, compels us to hold that the district court erred. (1) Boys Markets contemplates a finding in each case that the strike was over an arbitrable issue as a condition precedent to issuance of an injunction. (2) The injunction violated § 9 of the Norris-LaGuardia Act. (3) The injunction violated F.R.Civ.P. 65(d).
 
 
 30
 1. The district court's order of May 30 was nothing less than an injunction against striking for the life of the contract an order to work every day. Such overbroad use of the injunction is the very evil Norris-LaGuardia sought to remedy. It is not every strike which is enjoinable under Boys Markets, nor even every strike over an arbitrable issue. Boys Markets 389 U.S. at 253-54, 90 S.Ct. 1583; see Anheuser-Busch, Inc. v. Teamsters Local 633, 1 Cir. 1975, 511 F.2d 1097, 1099. The carefully drawn guidelines in Boys Markets clearly call for case-by-case adjudication.[17] In this case the effect of the district court's order is a determination that any strike would violate his order. This position forced the union to litigate the applicability of Boys Markets in a contempt proceeding, a situation strongly reminiscent of "government by injunction".[18]
 
 
 31
 2. We have not overlooked the fact that the order was couched in the exact words of the contract arbitration clause. Section 9 of the Norris-LaGuardia Act, however, requires that a labor injunction contain "only a prohibition of such specific act or acts as may be expressly complained of in the bill of complaint or petition filed in such case and as shall be expressly included in said findings of fact made and filed by the court . . .". 29 U.S.C. § 109 (1970). Here, no specific act is complained of in the motion for the amended preliminary injunction, nor prohibited in the injunction. See New York Telephone Co. v. CWA, 2 Cir. 1971, 445 F.2d 39, 49-50. Such an injunction cannot stand.
 
 3. Rule 65(d) reads as follows:
 
 32
 Form and Scope of Injunction or Restraining Order.
 
 
 33
 Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.
 
 
 34
 The rule embodies the elementary due process requirement of notice. Developments in the Law Injunctions, 78 Harv.L.Rev. 994, 1064-67 (1965).[19] In a pre-Boys Markets case, the Supreme Court was faced with the issue whether the Norris-LaGuardia Act prohibited the district court from enforcing an arbitrator's back-to-work order. In that case, when longshoremen later struck again over virtually the same issue, the district court found them in contempt of his prior order. The Supreme Court reversed, relying on Rule 65(d), because it was unclear from the order whether it applied to the second strike. The Court said:
 
 
 35
 The judicial contempt power is a potent weapon. When it is founded upon a decree too vague to be understood, it can be a deadly one. Congress responded to that danger by requiring that a federal court frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid.
 
 
 36
 Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n, 1967, 389 U.S. 64, 76, 88 S.Ct. 201, 19 L.Ed.2d 236.[20]
 
 
 37
 United States Steel argues that there can be no ambiguity here because the parties' own contract language was used. A collective bargaining agreement, however, is anything but a precise document; the parties themselves are often unsure of what it means. See Shulman, Reason, Contract and Law in Labor Relations, 68 Harv.L.Rev. 999, 1004-05, 1007 (1955). Indeed, the special nature of the collective bargaining agreement is the very reason for the arbitration clause. Id.; Cox and Bok, Labor Law, 503 (7th ed. 1969).
 
 
 38
 We are aware that the technique of couching an order in the language of the labor contract has been sanctioned in Old Ben Coal Co. v. UMW Local 1487, 7 Cir. 1974, 500 F.2d 950, and C. F. & I. Coal Co. v. UMW, 10 Cir. 1974, 507 F.2d 170.[21] Those courts hold that any strike in violation of a no-strike clause raises an issue of contract interpretation, namely, whether the strike violates the no-strike clause, and is therefore arbitrable. In this circuit, on the other hand, under Amster, the strike itself is not an arbitrable issue invoking the equitable powers of the court under Boys Markets. Buffalo Forge Co. v. United Steelworkers, 2 Cir. 1975, 517 F.2d 1207 (1975) is in agreement with Amstar. There the court aptly said "if a strike not seeking redress of any grievance is enjoinable, then the policy of Norris-LaGuardia is virtually obliterated." Id. at 1207.
 
 IV.
 THE STRIKE ISSUE
 
 39
 Applying the principles of Boys Markets, and giving full play to the presumption of arbitrability (Gateway at 379-80; Southwest Bell Tel. Co. v. CWA, 5 Cir. 1972, 454 F.2d 1333, 1336-37) as well as the extraordinarily broad arbitration clause in this contract, we conclude that the strike was not over an arbitrable issue. Boys Markets made it clear that an order to arbitrate directed at both parties goes hand in hand with the injunction. Boys Markets, 389 U.S. at 254, 90 S.Ct. 1583. It is beyond belief that the parties intended to arbitrate the question whether Alabama Power Company should import South African coal. United States Steel is correct when it states in its brief that this strike was in the nature of a political strike, more prevalent in Europe than in the United States. The record discloses that the miners' action was not aimed at United States Steel at all, but rather at the national policy of this country's permitting the importation of South African coal.[22] The black miners employed by United States Steel may have been motivated by opposition to South Africa's racial policies. White and black miners may have been motivated by resentment against the importation of coal produced by cheap labor. There is no intimation in the record that the strike was really aimed at United States Steel,[23] nor that the South African coal issue was subterfuge.[24] The court is clearly empowered to pierce the parties' own characterization of their dispute there was no occasion to do so here.
 
 
 40
 The miners' "memorial protest" in this case cannot be dragged into the shelter of "local trouble of any kind". That is the catch-all phrase used in the bargaining agreement as part of the definition of an arbitrable grievance. We construe this phrase to refer to a "local" as opposed to a "national" dispute. In any event, however, the "trouble" must be related to a grievance arising from the employment relationship between the company affected by the work stoppage and the striking employees. In this case the nature of the "trouble" is unarbitrable except, perhaps, by the Secretary of Labor, the Secretary of State, the President, and the Congress.
 
 
 41
 In reality, the Company asks this Court to focus on its grievance with the union, that is, the union's frequent, blatant, irresponsible disregard of its contractual no-strike obligation. Under the Boys Markets guidelines, however, we must focus on the union's grievance, for the evil remedied in Boys Markets was substitution by the union of economic weapons for arbitration in its effort to force the employer to respond to its demands. Boys Markets, 389 U.S. at 208-09, 90 S.Ct. 1583; see NAPA Pittsburgh, Inc. v. Automotive Employees Local 926, 3 Cir. 1974, 502 F.2d 321, 325-26, (Hunter, J. and Seitz, C. J., dissenting). Every company official testifying at the hearing said that there was no dispute between the union and United States Steel.
 
 
 42
 The company remains free to arbitrate the issue of the violation of the no-strike clause, and this Court will enforce an arbitrator's back-to-work order. New Orleans Steamship Ass'n v. General Longshoreworkers Local 1418, 5 Cir. 1968, 389 F.2d 369; see Boys Markets, 389 U.S. at 244 n. 10, 90 S.Ct. 1583; Gould, On Labor Injunctions, Unions and the Judge: The Boys Markets Case, 1970, S.Ct.Rev. 215, 244; 71 Colum.L.Rev. 336, 343-44 (1971). It is the employer, in this instance, who seeks to avoid arbitration in favor of the injunction remedy. NAPA at 328; Gould at 246.
 
 
 43
 An employer may discipline its work force for failure to work. We are sympathetic to the company's plight, for we have no doubt that such discipline would precipitate further strikes (in that case over an arbitrable issue). In light of the Norris-LaGuardia Act and the careful accommodation struck by Boys Markets, this Court cannot discipline the employees through contempt proceedings. The rule remains: federal courts do not enjoin strikes, and, as Justice Brennan stated in his Sinclair dissent, "there is no general federal anti-strike policy". Sinclair at 225. It is true that there is a trend toward judicial intervention in labor disputes, but that trend has not progressed to the point where we can enjoin this kind of strike.[25] We realize fully that our decision provides scant comfort to United States Steel, to similar companies, and to responsible union officials plagued by wildcat strikes. But we are compelled to suggest that the problem is one for Congress, not for the courts.
 
 V.
 CONTEMPT
 
 44
 We hold that the district court was without jurisdiction to issue the injunction of May 30. The union was adjudicated in civil contempt of that order, and the rule is that disobedience of a void preliminary injunction does not carry civil contempt penalties. United States v. United Mine Workers, 1947, 330 U.S. 258, 294-95, 67 S.Ct. 677, 91 L.Ed. 584; Emery Air Freight Corp. v. Local 295, 2 Cir. 1971, 449 F.2d 586, 592; Bethlehem Mining Company v. UMW, 3 Cir. 1973, 476 F.2d 860, 865; Developments in the Law Injunctions, 78 Harv.L.Rev. 994, 1080 (1965). Accordingly, the civil fine must be set aside.
 
 
 45
 Reversed and remanded.
 
 
 
 [1]
 Boys Markets v. Retail Clerks Union Local 770, 1970, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199
 
 
 [2]
 The matter of furnishing of rags was not an inconsequential matter for it had serious practical consequences involving a company rule against performing certain tasks without use of "rags", because to do so involved serious safety hazards and subjected the individual miners to discipline for violation of this company "rule"
 
 
 [3]
 At 9:10 A.M. on Saturday, June 15, the Company's Raw Materials General Superintendent, E. J. Files, had a phone call from Local 8982 President Lawson as follows:
 LAWSON: Do you know anything about Oak Grove?
 FILES: No, other than the men showed up on the owl shift, but went back. We will consider this as an illegal work stoppage.
 LAWSON: Well, they just jumped the gun. I know how you feel about this but we're going to protest Monday over South African Coal Shipments.
 FILES: Then Concord will be out Monday?
 LAWSON: Yes, but we'll be back on the owl shift Tuesday.
 FILES: Is this sanctioned by Mr. Miller?
 LAWSON: No, we couldn't get a hold of him.
 
 
 [4]
 The district court's Findings of Fact and Conclusions of Law, in pertinent part, were as follows:
 Findings of Fact
 
 
 [1]
 On May 30, 1974 this court issued a Preliminary Injunction as amended enjoining the defendants and each of them, their officers, agents and members and all persons acting in combination or concert with any of them, or aiding and abetting them until midnight, November 11, 1974, or until further Order of this Court from engaging in any strike or work stoppage at plaintiff's Concord Mine, or enlarging or extending any strike or work stoppage at Concord Mine to Oak Grove Mine over any disagreement about the interpretation or application of the collective bargaining agreement between the parties or any disagreement over any matter not mentioned in said agreement, or over local trouble of any kind, and from inducing or encouraging any of plaintiff's employees to engage in such a strike or work stoppage by word of mouth, sign signal, vote, advice or device of any kind, or in any other manner interfering with the business of plaintiff as a means of settling any such disagreement in a manner other than set out in the collective bargaining agreement, provided that as a condition to the issuance of this Preliminary Injunction plaintiff is enjoined when requested by the defendants to handle any such dispute or disagreement under the grievance and arbitration provisions of the collective bargaining agreement
 
 
 [3]
 After the issuance of the Preliminary Injunction and while said Injunction was in full force and effect a work stoppage occurred at the plaintiff's Oak Grove Mine on Saturday, June 15, 1974 beginning at 12:01 A.M. and ending with the next shift. Plaintiff's Oak Grove Mine again struck at 12:01 A.M. and plaintiff's Concord Mine also struck at 12:01 A.M. on Monday, June 17, 1974 and said strike was continuing at both mines at the time of the hearing on said order to show cause
 
 
 [4]
 The Court finds that a claimed memorial period had been called by the defendants and would last for 24 hours or until 12:01 A.M. on Tuesday, June 18, 1974. The Court finds that a dispute governed by the collective bargaining agreement between the parties exists concerning the right of the defendants to strike protesting the importation of South African coal by The Southern Company
 
 
 [5]
 The Court finds that substantially all of plaintiff's employees on the first two shifts for June 17, 1974 had failed to report to work and that said work stoppage by the defendants causes a loss to the plaintiff which exceeds Four Thousand Dollars per shift
 
 
 [6]
 Although the defendants contend that the motive of this strike is not covered by the collective bargaining agreement between the parties the Court finds that the defendants are attempting to circumvent its Order and are striking in violation of the collective bargaining agreement and have failed to take such action as is reasonable and appropriate to bring about compliance with this Court's Preliminary Injunction
 Conclusions of Law
 
 
 [1]
 The Preliminary Injunction was duly issued by the Court which had jurisdiction over the parties and the subject matter under 29 U.S.C.A. § 185 and notice thereof was duly communicated to the defendants on or before June 4, 1974, the date their appeal was filed. The strike which began at 12:01 A.M. on June 17 and has continued through the time of the hearing in this cause is a violation of the Preliminary Injunction
 
 
 [2]
 Defendants are responsible for said strike in violation of the Preliminary Injunction because of the authorization of the work stoppage over a dispute concerning the defendants' right to strike, protesting the importation of South African coal by The Southern Company and because of the actual participation therein by their officers and members who are agents acting within the line and scope of their authority
 
 
 [3]
 Issuance of an adjudication and order in civil contempt against the defendants is appropriate because of the defendants' acts herein which have been found to constitute civil contempt of this court's Preliminary Injunction
 
 
 [5]
 Section 301(a) reads:
 Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.
 
 
 [6]
 See International Ass'n of Machinists v. Cutler-Hammer, Inc., 271 App.Div. 917, 67 N.Y.S.2d 317, aff'd, 297 N.Y. 519, 74 N.E.2d 464
 
 
 [7]
 United Steelworkers v. American Mfg. Co., 1960, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403; United Steelworkers v. Warrior & Gulf Nav. Co., 1960, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409; United Steelworkers v. Enterprise Wheel & Car Corp., 1960, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424
 
 
 [8]
 Warrior & Gulf, 363 U.S. at 582-83, 80 S.Ct. 1347; Gateway Coal Co. v. UMWA, 1974, 414 U.S. 368, 377-78, 94 S.Ct. 629, 38 L.Ed.2d 583
 
 
 [9]
 In the infancy of the labor movement arbitration was one of the central demands of labor. The famous Pullman Strike was in part over the issue of arbitration. See O. Fiss, Injunctions 580-612 (1970); Gould, On Labor Injunctions, Unions, and the Judges: The Boys Markets Case, 1970 S.Ct.Rev. 215, 217
 
 
 [10]
 The Norris-LaGuardia Act applies only to federal courts. Dowd Box Co. v. Courtney, 1962, 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed.2d 483, made it clear that federal jurisdiction under § 301 was meant to supplement, not displace, state jurisdiction to enforce collective bargaining agreements. However, in Avco Corp. v. Aero Lodge 735, 1968, 390 U.S. 557, 88 S.Ct. 1235, 20 L.Ed.2d 126, the Court held that unions could remove state court suits to federal court, thereby in effect depriving state courts of their equitable power to grant injunctive relief. This holding precipitated a reappraisal of Sinclair, for, as the Court noted, Congress could not have intended to prevent state court injunctions when it passed the Taft-Hartley Act, with the purpose of extending union responsibility. See Boys Markets, 398 U.S. at 244-45, 90 S.Ct. 1583
 
 
 [11]
 The underlying rationale of Lincoln Mills is that Congress authorized federal courts to create a federal common law of labor. Friendly, In Praise of Erie and of the New Federal Common Law, 39 N.Y.U.L.Rev. 383, 412-13 (1964). Some commentators have preferred to look upon Lincoln Mills and its progeny as pure federal common law. See Note, The Federal Common Law, 82 Harv.L.Rev. 1512, 1531-35 (1969)
 
 
 [12]
 See Gould at 219-20; 88 Harv.L.Rev. 463, 466-70 (1974); 71 Colum.L.Rev. 336, 342 (1971); Isaacson, A Fresh Look at the Labor Injunction, 17 Am.Inst. of Sw. Leg. Found. 231, 253 (1971) ("(T)he decision was designed to further the right to arbitrate; it was not designed to curtail the right to strike."); Note, The New Federal Law of Labor Injunctions, 79 Yale L.J. 1593 (1970); Note, Labor Injunctions, Boys Markets & the Presumption of Arbitrability, 85 Harv.L.Rev. 636 (1972)
 
 
 [13]
 See 63 Geo.L.Rev. 275, 283 (1974); 88 Harv.L.Rev. 463 (1974)
 
 
 [14]
 Gateway Coal also held that the existence of an arbitration clause implied a no-strike obligation under the principles of Teamsters Local 174 v. Lucas Flour Co., 1962, 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593. Gateway Coal, 414 U.S. at 381-82, 94 S.Ct. 629. The union does not seriously contend that the absence of a no-strike clause exempts it from the rules of Boys Markets
 
 
 [15]
 The issue over which there is the most controversy in the Boys Markets arena, and over which there is a division in the circuits, is the refusal of sister unions to cross picket lines. In this Circuit and the Second Circuit, the striking local cannot be ordered back to work if the strike is not over an arbitrable grievance. Amstar Corp. v. Amalgamated Meat Cutters, 5 Cir. 1972, 486 F.2d 1372; Buffalo Forge Co. v. United Steelworkers, 2 Cir. May 1, 1975, 517 F.2d 1207. In the Third, Fourth, Seventh, and Eighth Circuits, a union can be enjoined from honoring picket lines because an issue of contract interpretation has arisen, namely, the union's right to strike in those circumstances in light of the no-strike clause. Island Creek Coal Co. v. UMWA, 3 Cir. 1975, 507 F.2d 650; Armco Steel Corp. v. UMWA, 4 Cir. 1974, 505 F.2d 1129; Pilot Freight Carriers v. Teamsters, 4 Cir. 1974, 497 F.2d 311, cert. denied, --- U.S. ---, 95 S.Ct. 2665, 45 L.Ed.2d 700; Inland Steel Co. v. UMWA, 7 Cir. 1974, 505 F.2d 293; Valmac Industries, Inc. v. Amalgamated Meat Cutters Local 425, 8 Cir. July 29, 1975, 519 F.2d 263, 89 L.R.R.M. 3073; NAPA Pittsburgh, Inc. v. Automotive Chauffeurs Local 926, 3 Cir. 1974, 502 F.2d 321 (en banc). But see Parade Publications, Inc. v. Philadelphia Mailers Union Local 14, 3 Cir. 1972, 459 F.2d 369, 374; United States Steel Corp. v. UMWA, 3 Cir. 1972, 456 F.2d 483, 487. We reject the reasoning of these cases because it would make any strike enjoinable during the life of a collective bargaining agreement containing a no-strike clause. Such a result cannot be justified by the careful guidelines of Boys Markets, and would emasculate the Norris-LaGuardia Act. See NAPA Pittsburgh at 334 (Adams, J. dissenting); 88 Harv.L.Rev. 463 (1974) (criticizing NAPA Pittsburgh ); Inland Steel at 300-01 (Fairchild, J. dissenting)
 In spite of Amstar, the district court here found that "a dispute governed by the collective bargaining agreement between the parties exists concerning the right of the defendants to strike protesting the importation of South African coal by the Southern Company".
 U. S. Steel argues that Gateway Coal has overruled Amstar. We disagree. Gateway Coal at most modified Amstar, if it can be read to say that the presumption of arbitrability did not apply in injunction cases. See Note, Labor Injunctions, Boys Markets & the Presumption of Arbitrability, 85 Harv.L.Rev. 636 (1972). Even before Amstar, the law in this circuit was that a dispute comes within an arbitration clause if it is "arguably arbitrable". Southwest Bell Tel. Co. v. CWA, 5 Cir. 1972, 454 F.2d 1333, 1336. Gateway Coal applied the guidelines laid down in Boys Markets; it did not relax them. See NAPA Pittsburgh at 335 (Adams, J. dissenting).
 
 
 [16]
 The Court stated:
 The Court will interpret the contract to cover any strike whatever other than one for a valid safety reason and will issue an injunction forbidding any strike whatsoever pending the trial of the case except for that one reason, except that the Court will not presume to extend its injunction past November 12, 1974. Is that when this contract expires?
 Mr. Stelzenmuller: Midnight, November 11.
 The Court: Midnight, November 11, 1974. (emphasis added).
 
 
 [17]
 The district court sought to justify a prospective injunction by the following language in Boys Markets :
 (A) prohibition against future strikes is warranted, and was contemplated by the author of the Sinclair dissent (and, therefore, presumably, was contemplated by the Supreme Court in Boy's Markets ). Why else would the Sinclair language be quoted in Boy's Markets which requires the District Judge to consider 'whether breaches are occurring and will continue, or have been threatened and will be committed.'
 We think that the court read too much into this language. Such findings, in almost identical words, are mandated by the Norris-LaGuardia Act before any labor injunctions may issue. Norris-LaGuardia Act § 7(a), 29 U.S.C. § 107(a) (1970).
 
 
 [18]
 See Frankfurter & Greene, The Labor Injunction (1930); Statutory History of the United States: Labor Organization 161-247 (R. Koretz ed. 1970); O. Fiss, Injunctions 580-612 (1970); A. Cox & D. Bok, Labor Law 76 (7th ed. 1961)
 
 
 [19]
 Analytically, the broadness of an injunction refers to the range of proscribed activity, while vagueness refers the particularity with which the proscribed activity is described. Developments in the Law Injunctions, 78 Harv.L.Rev. 994, 1064 (1965). "Vagueness" is a question of notice, i. e., procedural due process, and "broadness" is a matter of substantive law. See Wright & Miller, Federal Practice & Procedure § 2953 at 546-47 (1973). The district court's injunction was both overbroad (by reason of its prospectivity) and vague (because it substituted nebulous contractual terms for specific acts)
 
 
 [20]
 Professors Wright and Miller state the following rule:
 The drafting standard established by Rule 65(d) is that an ordinary person reading the court's order should be able to ascertain from the document itself exactly what conduct is proscribed.
 Wright & Miller, Federal Practice & Procedure § 2955 at 536-37 (1973).
 
 
 [21]
 In Old Ben Coal Co. v. UMW Local 1487, 7 Cir. 1972, 457 F.2d 162, the court narrowed a prospective injunction to the dispute at hand, but warned the union that continued strikes could result in a broader decree. After eight more strikes, the court, in Old Ben Coal Co. v. UMW Local 1487, 7 Cir. 1974, 500 F.2d 950, affirmed a prospective injunction couched in terms of the contractual arbitration clause, in light of the history of that case in the court. Id. at 953. In C.F. & I. Coal Co. v. UMWA, 10 Cir. 1974, 507 F.2d 170, 176-77, the court held that a history of strikes similar to those occurring in Alabama demonstrated an "unlawful proclivity" to strike, justifying an injunction against striking for the life of the contract, also tracking the arbitration clause. The court relied on cases involving regulatory injunctions procured by administrative agencies, see NLRB v. Express Publishing Co., 1941, 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930, and McComb v. Jacksonville Paper Co., 1949, 336 U.S. 187, 69 S.Ct. 497, 93 L.Ed. 599. The crucial difference, as we see it, between those cases and Boys Markets cases is that the former are public law cases, illustrating the broader authority accorded administrative agencies in their effort to enforce administrative schemes of regulation. See Developments in the Law Injunctions, 78 Harv.L.Rev. 994, 1065 (1965). It must be remembered that a § 301 suit is a private contract action. Sinclair at 458 (Brennan, J. dissenting). While the public welfare is a consideration in whether an injunction should issue at all, see Wright & Miller, Federal Practice & Procedure § 2948 at 457 (1973), the traditional requirements of specificity and the public policy of Norris-LaGuardia still apply to labor injunctions
 
 
 [22]
 Nonetheless the concerted refusal to work in this case is clearly a strike. See Taft-Hartley Act § 501(2), 29 U.S.C. § 142(2) (1970):
 The term 'strike' includes any strike or other concerted stoppage of work by employees (including a stoppage by reason of the expiration of a collective bargaining agreement) and any concerted slowdown or other concerted interruption of operations by employees.
 
 
 [23]
 This case was argued on a Boys Markets theory. We note that United States Steel has a remedy for a secondary boycott through an NLRB § 10(l ) injunction, 29 U.S.C. § 160(j) (1970), or a Taft-Hartley § 303 damage suit. See NLRA § 8(b)(4), 29 U.S.C. § 158(b)(4) (1970)
 
 
 [24]
 It is true that the district court, in its Findings of Fact accompanying the adjudication of contempt on June 17, 1974, said that "the defendants are attempting to circumvent its Order, and are striking in violation of the collective bargaining agreement . . ." Read in context, this does not amount to a finding that the union was using the South African coal issue as a pretext. This is so because in the preliminary injunction the court enjoined all strikes whatever during the life of the contract, and any strike would "circumvent its Order"
 
 
 [25]
 An overview of American labor law from the early days of Norris-LaGuardia to Gateway Coal reveals a careful and gradual trend toward judicial enforcement of collective bargaining agreements like ordinary contracts. But courts have been reluctant to extend the injunctive remedy for historical reasons, and for the practical reason that an injunction must be enforced, if need be, by force. Our labor law places a high priority on avoidance of civil strife, Taft-Hartley Act § 1(b), 29 U.S.C. § 141(b) (1970); NLRA § 1, 29 U.S.C. § 151 (1970), and this includes strife between labor and the government. See A. Cox & D. Bok, Labor Law 76 (7th ed. 1969). How far courts can go in making collective bargaining agreements specifically enforceable in their entirety depends in large part on how much judicial intervention labor is willing to accept without resistance. This is a policy judgment best left to Congress
 For an interesting comparative discussion of the unique nature of the collective bargaining agreement, and its varying levels of enforceability as a contract in Europe see Kahn-Freund, Pacta Saunt Servanda A Principle & Its Limits: Some Thoughts Prompted by Comparative Labour Law, 48 Tulane L.Rev. 894 (1974). Professor Otto Kahn-Freund writes:
 It is perhaps to be regretted that labour lawyers do not often show an interest in comparative law, and even more that few comparative lawyers pay much attention to labour law. All comparative lawyers share a concern in the scope of contractual obligations in the organisation of society. The law of collective labour relations demonstrates that the boundary between nudum pactum and enforceable contract, between social and legal sanctions, is not only, as everyone knows, variable in time, but also variable in space. This simple insight may perhaps deprive some current discussions of their pathos and their moralising flavour.