## UNITED STATES STEEL CORPORATION

v.

## UNITED MINE WORKERS OF AMERICA et al., Appellants.

### Nos. 75–1504, 75–1509.

United States Court of Appeals, Third Circuit.

Argued Dec. 9, 1975.

Decided March 16, 1976.

As Amended April 6 and 13, 1976.

Rehearing and Rehearing In Banc Denied May 20, 1976.

Leonard L. Scheinholtz, Henry J. Wallace, Jr., Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for appellee, U. S. Steel Corp.; Billy M. Tennant, U. S. Steel Corp., Pittsburgh, Pa., of counsel.

Joseph A. Yablonski, Harrison Combs, Paul R. Hoeber, Richard L. Trumka, Washington, D. C., Kenneth J. Yablonski, Washington, Pa., for appellants.

Before SEITZ, Chief Judge, and GIBBONS and ROSENN, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

These are appeals from an order granting a *Boys Markets*[1] preliminary injunction prospectively enforcing an implied no-strike undertaking in the National Bituminous Coal Wage Agreement which became effective December 5, 1974. A single injunction[2] was issued as follows:

It is, therefore, ordered, adjudged and decreed:

1. That a Preliminary Injunction is hereby issued enjoining the defendants, United Mine Workers of America, District 5, United Mine Workers of America, and Local 1248, United Mine Workers of America, their officers, representatives, members, and all persons acting in concert with them, or in their behalf, during the pendency of this preliminary injunction and until final determination from

(a) Engaging in a strike or work stoppage at the plaintiff's Maple Creek Mine located in Washington County, Pennsylvania; or

(b) Picketing or in any other manner interfering with operations at the plaintiff's Maple Creek Mine located in Washington County, Pennsylvania, because of any difference concerning the meaning and application of the provisions of the Agreement or any difference about matters not specifically mentioned in the Agreement or because of any local trouble of any kind arising at the mine.

2. It is further ordered that the defendants, their officers, representatives and members are hereby directed to utilize the Settlement of Disputes procedure of the 1974 Bituminous Coal Wage Agreement for the resolution of the following disputes:

(a) The dispute as to whether the plaintiff is required to furnish security guards from dusk to dawn at the employee parking lots at the Maple Creek Mine;

(b) The dispute as to whether the employees at the Maple Creek Preparation Plant have the right to refuse to work with Richard Beranek, a bargaining unit employee, because he worked on December 17 and 18, 1974, during an illegal work stoppage at the Maple Creek Mine; and

(c) The seniority dispute involving the filling of a temporary vacancy at Maple Creek Mine #1 in the job of slate motorman, including arbitration, if necessary.

3. It is further ordered that during the pendency of this preliminary injunction and pending final determination, the defendants, their officers, representatives and members utilize the Settlement of Disputes procedure for the resolution of any further ". . . differences . . between the Mine Workers and the Employer as to the meaning and application of the provisions of said agreement

---

1. *Boys Markets, Inc. v. Retail Clerks, Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970).

2. The proceedings in No. 75–1504 were commenced in the district court on February 12, 1975. Proceedings in No. 75–1509 were initiated on February 24, 1975. Although the district court entered a single order, separate appeals to this court were taken. The two cases were consolidated into this single appeal.

. . ." and ". . . differences . . . about matters specifically mentioned in said agreement . . ." and ". . . any local trouble of any kind arising at the mine . . ." including if necessary, final and binding arbitration.

4. It is further ordered that the defendants' officers, and representatives, pending final determination of this case, take all action which may be necessary to assure compliance with the terms of the 1974 Bituminous Coal Wage Agreement, during pendency of this preliminary injunction.

*United States Steel Corp. v. United Mine Workers of America,* 393 F.Supp. 936, 941 (W.D.Pa.1975). The specific references in subparagraphs (a), (b) and (c) of paragraph 2 of the injunction order are to three specific disputes which resulted in work stoppages. Paragraphs 1, 3 and 4 of the injunction, however, go far beyond a prohibition of strikes over those three specific disputes. They amount to a general prohibition against a strike over any dispute falling within the Settlement of Disputes provisions of the 1974 agreement. The defendants, United Mine Workers of America (UMW), District No. 5, United Mine Workers of America (District 5), and Local Union No. 1248, United Mine Workers of America (the Local) urge on appeal (1) that neither the specific disputes which resulted in work stoppages nor the broad range of disputes which would fall within the terms of the injunction are arbitrable under the 1974 agreement, and thus no *Boys Markets* injunction was proper; (2) that the work stoppages were wildcat strikes of which the Local, District 5, and the UMW disapproved, and for which they should not be subjected to an injunction; (3) that the prospective injunction is both overbroad, going beyond the relief permitted by *Boys Markets* and § 9 of the Norris-LaGuardia Act, 29 U.S.C. § 109, and so vague as to be inconsistent with Rule 65(d) Fed.R.Civ.P;

(4) that the injunction which relegates the union defendants to grievance-arbitration remedies until the further order of the court does not impose a correlative obligation upon the employer; and (5) that the plaintiff has not shown the likelihood of irreparable injury pending final hearing. We conclude that the district court could properly have issued a *Boys Markets* injunction enforcing the grievance-arbitration provisions of the 1974 agreement, but that the injunction issued in this case must be vacated.

## I. Facts and Proceedings in the District Court

At its Maple Creek complex in Washington County, Pennsylvania, the plaintiff United States Steel Corporation operates two large underground mines and a coal preparation plant. For many years the production and maintenance workers employed at Maple Creek have been represented in collective bargaining by the UMW, District 5, and the Local. On December 5, 1974 the National Bituminous Coal Wage Agreement of 1974 became operative. Both prior to that date and thereafter there had been a series of work stoppages[3] at Maple Creek which resulted in suits by United States Steel Corporation under § 301 of the Labor Management Relations Act of 1947,[4] for injunctive relief. The three work stoppages which resulted in the order appealed from occurred between February 12, 1975 and February 25, 1975.

The first of these work stoppages commenced early on February 12, 1975 when Thomas Cunningham, Chairman of the Local's grievance committee, spoke to the mine foreman at Maple Creek Mine No. 2 about the theft of an employee's truck from the mine parking lot the previous evening. Cunningham explained that the men were upset about the stolen truck and wanted a permanent security guard posted in the parking lot. The foreman reported that there would be no increased security. At

---

**3.** In the twelve months prior to the events involved in this appeal it appears that the employees had engaged in at least four other work stoppages.

**4.** 29 U.S.C. § 185.

that point the Mine No. 2 midnight shift walked out. At Mine No. 1 Martin Connors, Treasurer of the Local, also asked the foreman for that mine about a permanent security guard in the parking lot. He was told of the company's position. When he informed the men who worked the midnight shift in Mine No. 1 of the company's position they, too, walked out. That same day United States Steel brought suit against the three defendants under § 301. The district court issued a temporary restraining order which was served on the Local on February 13. Meanwhile, on the evening of February 12, the officers of the Local met with the membership and ordered the miners back to work. The members were also advised that both District 5 and the UMW ordered them to return to work. These orders were of no avail. A similar meeting on the night of February 13 was also fruitless.

On February 14 the district court, on the motion of United States Steel, held a hearing in which it adjudged the Local to be in civil contempt of the temporary restraining order and imposed a $10,000 conditional fine which was to be suspended if the order was obeyed by February 14 at 4 p. m., but was to increase by $5000 each day thereafter that the members failed to comply. The officers of the Local called another membership meeting, and this time successfully prevailed upon the men to resume work.

On February 24, the midnight shift employees at the coal preparation plant suddenly refused to work with a fellow UMW member, Richard Beranek, because Beranek had, during a December 1974 work stoppage over an arbitrable grievance, crossed a picket line.[5] United States Steel filed a new complaint and the district court issued a second temporary restraining order. At 4 p. m. on February 24, the employees in the coal preparation plant returned to work.

On February 25, the midnight shift at Maple Creek Mine No. 1 refused to go to work because of a dispute over a job assignment. The stoppage spread to Mine No. 2 and to the coal preparation plant on the daylight shift. The company filed a third § 301 suit. When the Local was served with the order to show cause in the second suit it called a special meeting at which its officers told the men to return to work. They did so on the afternoon shift.

In the three complaints United States Steel sought both injunctive relief and damages. In the prayers for injunctive relief the complaints sought not merely orders prohibiting work stoppages pending arbitration of the specific disputes which led to those stoppages, but an order directing that the three defendants, their officers, representatives and members "utilize the Settlement of Disputes procedures of the 1974 agreement . . . for the resolution of any grievances, differences, or local trouble . . . including, but not limited to [the specific disputes]."

An evidentiary hearing was held on United States Steel's application for a preliminary injunction on February 27 and 28. By stipulation and testimony the foregoing facts were established, as was the likelihood that a protracted interruption of the supply of metallurgical coal from Maple Creek would cause a widespread shutdown of blast furnace operations in western Pennsylvania. The district court found within the prior twelve months there had been seven work stoppages at the Maple Creek complex, including the three in February 1975, over disputes which were subject to resolution under the Settlement of Disputes procedure of the 1974 and the prior 1971 National Bituminous Coal Wage Agreement, and that all seven required resort to the § 301 remedy in the district court. The court found specifically that the February 12, February 24, and February 25 work stoppages were all subject to resolution under the Settlement of Disputes provisions of the 1974 agreement, that those work stoppages breached the agreement, and that unless restrained by the court such breaches

---

5. In Civil Action No. 74–1175 the district court issued a *Boys Markets* injunction against the December work stoppage. Despite the court's determination that the strike violated the agreement the Local brought intra-union charges against Beranek.

would continue. Based on these findings of fact the preliminary injunction quoted above was entered. There was no finding of fact that the officers of the Local, of District 5, or of the UMW encouraged or condoned the work stoppages.[6] Nevertheless, the district court made the following conclusion of law:

> "The defendants are responsible for the mass action of their members in resorting to self help through work stoppages in violation of the implied no-strike clause of the labor agreement."[7]

It is clear from the court's discussion elsewhere in its opinion that this conclusion of law refers only to the availability against the defendants of injunctive relief, not to their liability in damages.[8]

## II. Availability of any *Boys Markets* remedy

On appeal the defendants urge that unlike the 1971 and 1968 agreements with which this and other courts became all too familiar, the 1974 agreement cannot be construed as impliedly[9] prohibiting work stoppages such as those which occurred in February 1975. Their answer, which was not served or filed until after the district court's decision on the motion for a preliminary injunction, pleads this contention as a first defense. United States Steel questions whether the issue is properly before us in view of certain stipulations made at the hearing on the preliminary injunction. The defendants stipulated to the truth of the allegations in paragraph 9 and the first sentence of paragraph 10 of the complaints, quoted in the margin.[10] This stipulation would seem to establish that the 1974 agreement includes a provision for final and binding arbitration at least as broad as that in the 1971 agreement, which we construed in *Island Creek Coal Co. v. United Mine Workers of America*, 507 F.2d 650 (3d Cir.), cert. denied, 423 U.S. 877, 96 S.Ct. 150, 46

---

6. Nor was there any finding that those officers were blameless.

7. Conclusion of Law 6 (243a). At the time of its March 13 opinion and order the district court made certain findings of fact and conclusions of law that are not annexed to the reported decision.

8. In this connection the district court stated:
 The principal complaint of the plaintiff is against the membership in the local union. The plaintiff complains incidentally against the District and the International because they failed to force the local union members to perform in accordance with the Agreement, or failed otherwise to impose sanctions upon the local union members as the plaintiff contends both the District and the International were bound to do. It may be that this is so and may very well be proven at the final hearing of this case. The evidence presented before me up until now relates only to the procurement of a preliminary injunction to compel members of Local 1248 to continue their employment in the mine in spite of any grievances or complaints which are susceptible to the grievance machinery.
 393 F.Supp. at 940.

9. Neither the 1971 nor 1974 National Bituminous Coal Wage Agreements contained an express no-strike covenant.

10. 9. The 1974 Agreement further provides, in Article XXVII, that:

"MAINTAIN INTEGRITY OF CONTRACT AND RESORT TO COURTS

"The United Mine Workers of America and the Employers agree and affirm that, except as provided herein, they will maintain the integrity of this contract and that all disputes and claims which are not settled by agreement shall be settled by the machinery provided in the 'Settlement of Disputes' Article of this Agreement unless national in character in which event the parties shall settle such disputes by free collective bargaining as heretofore practiced in this industry, it being the purpose of this provision to provide for the settlement of all such disputes and claims through the machinery in this contract and by collective bargaining without recourse to the courts.

"The Employer, however, expressly authorizes the Union to seek judicial relief, without exhausting the grievance machinery, in cases involving successorship."

10. The 1974 Agreement provides in Article XXIII a procedure for resolution of ". . . differences . . . between the Mine Workers and the Employer as to the meaning and application of the provisions of [said] agreement . . .: and ". . . differences . . . about matters not specifically mentioned in [said] agreement . . ." and ". . . any local trouble of any kind [arising] at the mine . . ." including, if necessary, final and binding arbitration.

L.Ed.2d 110, (1975). The text of the Settlement of Disputes provision was before the district court, however, and is before us. We are dealing with an interlocutory order, and § 301 jurisdiction of the district court in any further proceedings looking to permanent injunctive relief will depend upon whether the agreement in fact provides for arbitration. We do not construe counsel's oral stipulation to the accuracy of the quotation of the contract provisions, in open court in the hearing on the preliminary injunction, as a concession as to the legal effect of the agreement for purposes of the entire case. Thus, despite the stipulation, it is appropriate to address the contention that the 1974 agreement differs significantly from those of 1968 and 1971 with respect to the arbitrability of disputes.

■ *Island Creek Coal Co. v. United Mine Workers of America, supra,* held that the grievance-arbitration undertaking in the 1971 national agreement was "unusually broad; broad enough to permit the arbitrator to decide issues which the parties did not specifically resolve in the bargaining

process." 507 F.2d at 653. The defendants urge that the scope of the grievance-arbitration undertaking has in the current agreement been significantly narrowed. The key provisions in the 1971 agreement were Article XVII, § (b), and Article XX. The equivalent provisions in the 1974 agreement are Article XVIII, § (c) and Article XXVII. The respective texts are quoted in parallel columns in the margin.[11] The significance of the differences escapes us.

The section in the 1974 agreement dealing with grievance procedures omits the parenthetical clause that the parties will not be represented by counsel. Except for this omission the introductory clause of that section is identical with the equivalent 1971 clause. After that introductory clause the 1974 agreement adds the following new language:

"Disputes arising under this agreement shall be resolved as follows:"

Then follows the same five step grievance-arbitration arrangement set forth in the 1971 agreement. The only change from 1971 made in the Integrity of the Contract

11.

| 1971: Article XX Maintain Integrity of Contract | 1974: Article XXVII Maintain Integrity of Contract and Resort to Courts | 1971: Article XVII Settlement of Disputes Section (b) Grievance Procedure | 1974: Article XXIII Settlement of Disputes Section (c) Grievance Procedure |
|---|---|---|---|
| The United Mine Workers of America and the Employees agree and affirm that they will maintain the integrity of this contract and that all disputes and claims which are not settled by agreement shall be settled by the machinery provided in the "Settlement of Disputes" article of this agreement unless national in character in which event the parties settle such disputes by free collective bargaining as heretofore practiced in the industry, it being the purpose of this provision to provide for the settlement of all such disputes and claims through the machinery in this contract provided and by collective bargaining without recourse to the courts. | The United Mine Workers of America and the Employers agree and affirm that, except as provided herein, they will maintain the integrity of this contract and that all disputes and claims which are settled by agreement by the machinery provided in the "Settlement of Disputes" Article of this Agreement unless national in character in which event the parties shall settle such disputes by free collective bargaining as heretofore practiced in the industry, it being the purpose of this provision to provide for the settlement of all such disputes and claims through the machinery in this contract and by collective bargaining without recourse to the courts. | Should differences arise between the Mine Workers and the Employer as to the meaning and application of the provisions of this agreement, or should differences arise about matters not specifically mentioned in this agreement, or should any local trouble of any kind arise at the mine, an earnest effort shall be made to settle such differences at the earliest practicable time. (The parties will not be represented by legal counsel at any of the steps below) . . . . . The Employer, however, expressly authorizes the Union to seek judicial relief without exhausting the grievance machinery, in cases involving successorship. | Should differences arise between the Mine Workers and the Employer as to meaning and application of the provisions of this Agreement, or should differences arise about matters not specifically mentioned in this Agreement, or should any local trouble of any kind arise at the mine, an earnest effort shall be made to settle such differences at the earliest practicable time. Disputes arising under this Agreement shall be resolved as follows . . . |

clause is the express exception of cases involving successorship. The defendants would have us conclude that by inserting the clause "Disputes arising under this agreement shall be resolved as follows," the parties intended to restrict grievance-arbitration to contract issues only, and thereby to exclude from arbitration "matters not specifically mentioned in this Agreement" and "local trouble of any kind". If that had been intended there would have been no point in carrying forward the language of the 1968 and 1971 agreements, which have been so frequently construed by the federal courts,[12] most authoritatively by the Supreme Court in *Gateway Coal Co. v. United Mine Workers of America*, 414 U.S. 368, 374–76, 94 S.Ct. 629, 635–636, 38 L.Ed.2d 583, 590–591 (1974). We conclude that the language change relied on made no change of substance in the rights and obligations of the covenanting parties. The introductory clause in Article XXIII, § (c), referring to "differences . . . about matters not specifically mentioned in this Agreement" and to "any local trouble of any kind" still defines the scope of the parties' arbitration undertaking with respect to local disputes. If that clause gives the union and the employee the right to grieve and arbitrate a given local dispute, that remedy must be pursued in preference to a work stoppage.

We have no difficulty agreeing with the district court that the employees could have grieved and arbitrated over the absence of a security guard at the parking lot, over the work assignment at Mine No. 1 on February 25, and over the work assignment of Beranek. These all were at least "local trouble" of some kind. Thus we reject the contention that no *Boys Markets* preliminary injunction was appropriate.[13]

## III. Injunctive relief against the unions

The UMW, District 5 and the Local all contend that since no finding was made that any of their officers or agents encouraged or condoned the unauthorized work stoppages, no injunction, and a *fortiori* no prospective injunction should have been entered against them. The district court did find that there was no evidence that either the UMW or District 5 took any action to end the work stoppages of February 24 and February 25, and that the only action taken by the UMW and District 5 to end the February 12 work stoppage was to transmit a telegram to the officers of the Local disavowing it, along with some oral instructions to resume work. The court also found that the officers of the Local ordered the men to return to work following the February 12 work stoppage only after they were adjudged in civil contempt, and even then not until after the expiration of the time fixed by the court within which they and their Local could purge themselves of that contempt by returning to work. The court found, moreover, that the work stoppages were actions of the Local engaged in by the concerted action of the employee-members.

---

**12.** *See, e. g., Jones & Laughlin Steel Corp. v. United Mine Workers of America*, 519 F.2d 1155 (3d Cir. 1975); *Island Creek Coal Co. v. United Mine Workers of America, supra; United States Steel Corp. v. United Mine Workers of America*, 519 F.2d 1236 (5th Cir. 1975), petition for cert. filed, 44 U.S.L.W. 3626 (U.S. Apr. 26, 1976) (No. 75–1562); *Armco Steel Corp. v. United Mine Workers of America*, 505 F.2d 1129 (4th Cir. 1974), cert. denied, 423 U.S. 877, 96 S.Ct. 150, 46 L.Ed.2d 110, (1975); *Inland Steel Co. v. Local 1545, UMW*, 505 F.2d 293 (7th Cir. 1974); *C F & I Steel Corp. v. United Mine Workers of America*, 507 F.2d 170 (10th Cir. 1974); *Old Ben Coal Corp. v. Local 1487, UMW*, 500 F.2d 950 (7th Cir. 1974); *Old Ben Coal Corp. v. Local 1487, UMW*, 457 F.2d 162 (7th Cir. 1972). The courts are not in complete agreement as to the meaning of the language. Compare *Island Creek Coal Co. v. United Mine Workers of America, supra*, with *United States Steel Corp. v. United Mine Workers of America, supra*.

**13.** At the proceedings in the district court at the hearing on the preliminary injunction, no effort was made to introduce evidence of a bargaining history which would tend to support defendants' contention that the 1974 national agreement intended to accomplish a change in the scope of the arbitration undertaking. Whether such parol evidence would be admissible at the final hearing is a matter on which the district court should rule in the first instance. With nothing more before us than the agreement, we have construed it as making no such change.

None of these findings is claimed to be clearly erroneous. It is the defendants' position that they are insufficient as a matter of law to support the entry of a preliminary injunction against them.

The unions rely in advancing this argument on the proposition that a labor union's liability for damages arising from the acts of its officers or members in breach of a contractual undertaking is measured by "ordinary doctrines of agency."[14] It points to repeated statements in the case law that unions cannot be held financially responsible for wildcat strikes. *See, e. g., Lewis v. Benedict Coal Corp.,* 259 F.2d 346, 351–52 (6th Cir. 1958), *aff'd by an equally divided Court,* 361 U.S. 459, 80 S.Ct. 489, 4 L.Ed.2d 442 (1960); *United Construction Workers v. Haislip Baking Co.,* 223 F.2d 872, 877 (4th Cir.), *cert. denied,* 350 U.S. 847, 76 S.Ct. 87, 100 L.Ed. 754 (1955). The degree of union responsibility for the consequences of a strike in breach of an express no-strike agreement has recently received extended consideration in this court. *See Eazor Express, Inc. v. International Brotherhood of Teamsters,* 520 F.2d 951 (3d Cir. 1975), *cert. denied,* 424 U.S. 935, 96 S.Ct. 1149, 47 L.Ed.2d 342 (1976); *Penn Packing Co. v.*

*Meat Cutters, Local 195,* 497 F.2d 888 (3d Cir. 1974); *cf. Meat Cutters, Local 195 v. Cross Brothers Meat Packers, Inc.,* 518 F.2d 1113 (3d Cir. 1975) (enforcement of arbitrator's award of damages). In *Eazor Express* Judge Maris held that a no-strike undertaking pending arbitration necessarily implied an obligation on the part of the union parties to use every reasonable means to bring an end to a strike begun by their members without authorization.[15] Although the defendant unions in *Eazor Express* had used the written and spoken word in an effort to end the walkout, at least to the same extent as did the defendants here, this court affirmed the award of damages because the record supported the court's finding that the defendant unions did not fulfill the obligation implied by law to use every reasonably means to end an illegal strike. Stronger measures were indicated, were available, and should have been taken. *See* 520 F.2d at 964.

The unions attempt to distinguish *Eazor Express* and *Penn Packing* on two related grounds. They first argue that before they can be held responsible under § 301 for wildcat strikes, they must expressly assume liability for such activity in the collective

---

**14.** *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 736, 86 S.Ct. 1130, 1144, 16 L.Ed.2d 218, 233 (1966). The Court in that case recognized that in a § 301 suit, § 301(e) of the Labor Management Relations Act, 29 U.S.C. § 185(e), requires an ordinary agency analysis rather than application of the more rigorous actual participation test of § 6 of the Norris-LaGuardia Act, 29 U.S.C. § 106.

**15.** Judge Maris said:
 The district court held that necessarily implied in the unions' agreement that there should be no strike was an obligation on their part to use every reasonable means to bring to an end a strike begun by their members without their authorization. With this conclusion we agree. As the district court pointed out, collective bargaining agreements such as these impose a continuing day-to-day obligation on the parties to fulfill their terms in good faith. *Curtiss-Wright Corp., Wright Aero. Div. v. NLRB,* 3d Cir. 1965, 347 F.2d 61, 68; *see Conley v. Gibson,* 1957, 355 U.S. 41, 46, 78 S.Ct. 99, 2 L.Ed.2d 80. This is certainly true with respect to the obligation that there should be no strike pending the

use of grievance procedure. Accordingly, in the case of an unauthorized strike against their employer by all the members of a union who are employed by that employer, their union may not disclaim responsibility for the losses suffered by the employer as the result of the strike unless and until it has exhausted all reasonable means within its power to bring that unlawful action to an end. A no-strike agreement would be illusory indeed were a union to be permitted to avoid all responsibility under it for the duration of a prolonged strike which was being carried on by the concerted action of all its members employed in the struck operation, merely because the strike was not initially authorized or called by the union as an organization or by those of its officers who were specially empowered to do so. Rather than to construe a contract as producing such a result, the courts will favor a construction making the mutual promises binding and giving the contract legal effect. 1A *Corbin on Contracts* 8–9; 3 *Corbin on Contracts* 168–171; 17 Am.Jur.2d 452.
 520 F.2d at 959–60.

bargaining agreement. The unions correctly point out that contract in *Penn Packing* did contain a liability clause of this kind. But the contract in *Eazor Express* contained a mere covenant not to strike, and Judge Maris implied in that general language a specific promise by the union to use all reasonable means to end unauthorized work stoppages.

 The unions also urge that *Eazor Express* and *Penn Packing* are distinguishable because in both cases the collective bargaining agreements contained express no-strike covenants. They contend that there is no basis for implying an "all reasonable efforts" obligation from a no-strike covenant that is itself implied by law. That argument necessarily rests on the premise that the no-strike covenant which the Supreme Court found implicit in the virtually identical contract in *Gateway Coal Co. v. United Mine Workers of America, supra,* somehow enjoys a less significant legal status than an express covenant. Such an approach was laid to rest as long ago as *Local 174, Teamsters Union v. Lucas Flour Co.,* 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962), when the Court held that a refusal to imply a no-strike undertaking from a binding arbitration clause "would obviously do violence to accepted principles of traditional contract law." *Id.* at 105, 82 S.Ct. at 578, 7 L.Ed.2d at 600. The unions are parties to a contract not to strike over an arbitrable dispute, and they have a contractual obligation to use all reasonable efforts to perform that contract. Concern with the integrity and efficacy of the agreed-upon arbitration process is no less compelling when the covenant not to strike is implied rather than express.

It is true that Judge Maris in *Eazor Express* distinguished *United Construction Workers v. Haislip Baking Co., supra,* on the ground that there, as here, the collective bargaining agreement did not contain

an express no-strike clause. If *Eazor Express'* reference to *Haislip Baking* can be understood as suggesting that a reasonable efforts obligation will not be implied from a no-strike obligation that is itself implied, it is mere dictum. And in context, it is far from clear that Judge Maris was doing anything more than distinguishing inapposite precedent, and was actually subscribing to the truth of the proposition. In any event, because we believe that this is a distinction without a difference, we choose not to accord that dictum the force of law.

Moreover, it would seem that the defendant unions' explicit agreement in Article XXVII of the 1974 contract to

> "maintain the integrity of the contract and that all disputes and claims which are not settled by agreement shall be settled by the machinery provided in the 'Settlement of Disputes' Article"

vitiates their claim that an express contractual basis for implying a reasonable efforts obligation is lacking in this case. From *Lucas Flour* we know that a no-strike undertaking will be implied from a grievance and arbitration clause. A covenant to maintain the integrity of the contract necessarily embraces a reasonable efforts obligation to comply with the no-strike promise.

Quite apart from the unions' reasonable efforts obligation, there is the district court's holding that the defendant unions are responsible for the mass action of their members who engaged in a work stoppage in breach of the agreement. In *Eazor Express* we approved the so-called mass-action theory as a basis for holding unions responsible for the actions of their members.[16] *Accord, Foam & Plastics Division, Tenneco Chemicals, Inc. v. Local 401, Teamsters,* 520 F.2d 945, 947–48 (3d Cir. 1975).

 As stated by Judge Maris, union liability under this theory is imputed from the

---

**16.** We said in *Eazor Express* that
"[w]hen all the members of a union employed by a given employer engage in a concerted strike not formally authorized by the union, as happened here, many courts hold the union responsible on the theory that mass action by union members must realistically be regarded as union action. The premise is that large groups of men do not act collectively without leadership and that a functioning union must be held responsible for the mass action of its members."
520 F.2d at 963.

concerted activity of the membership. Consistent with theory, however, the liability must be limited to the entity whose membership acts in concert. In most cases, as here, that entity will be the local union. Thus absent a showing of complicity on the part of a larger union entity—the District or International Union, for example—only the local can be held liable under the mass action theory. Since there is no record evidence demonstrating District 5 or International complicity in the instant work stoppages, only the Local's liability need be considered.

Although the mass-action theory approaches the question of union liability on a different tack, it does not enlarge the scope of that liability beyond the boundaries described by the implied "all reasonable efforts" obligation. Judge Maris recognized that

"courts upholding liability . . . upon the mass action theory . . . have stressed the failure of the unions involved to take steps, other than written and oral exhortation, speedily to terminate illegal strikes as an indication of passive acquiescence in the strike."

520 F.2d at 964.

Contrary to the assertion of Judge Rosenn, I do not believe that the mass-action theory creates strict union liability for the conduct of the membership before or at the inception of the strike. The carefully-crafted "all reasonable efforts" obligation of *Eazor Express* comes into operation by virtue of the membership mass action. But exposing even the local union to absolute liability (albeit under an alternative theory), irrespective of the strength of officers' efforts to dissuade the membership from engaging in prohibited conduct, was not the intended result of *Eazor Express.* The scope of liability under the mass-action theory must be viewed as drawing content from Judge Maris' discussion of union efforts to stop a strike.

In each instance, therefore, and irrespective of the theory upon which union liability for unauthorized strikes is premised, the court must inquire into the reasonableness of the attempts by local and parent union officials to avert or halt wildcat activity by the membership. What is reasonable depends, of course, on the context of the case. Because this case is before us on a preliminary injunction only, we express no view as to whether the evidence tending to show breach of this obligation sufficed to make the unions liable in damages. But certainly the mass action of the membership, together with the relatively modest efforts made by the defendant unions to prevent the several work stoppages sufficed as a predicate for the district court to specifically enforce the collective bargaining agreement.

This last observation serves to focus upon the analytical deficiency of the unions' position at this stage in the proceedings. There is an enormous difference between holding the unions financially liable for the wildcat activities of possibly unruly members, and directing the entities and their responsible officers to take steps to specifically perform the contract. It does not follow that merely because an action in breach of a contract was by an unauthorized agent, the principal may idly sit by and take no steps to prevent continuance or recurrence. We have no occasion, in the present posture of the case, to consider the extent, if any, to which the members' actions may make the UMW, District 5 or the Local liable in damages. Preliminary injunctive relief was appropriate on this record even if on ordinary agency principles they would not be liable for such damages. Prompt efforts to secure compliance with the injunctions may well have protected the union treasuries from financial liability for failure to take reasonable means to end the strike. Certainly the court did not have to permit District 5, the International and their officers to wash their hands of the local dispute merely because they expressed disapproval of the strike. They were required by the contract and could properly be ordered by the court to take steps to vindicate the arbitral process.

## IV. Overbreadth and vagueness

The defendants also urge that assuming some *Boys Markets* injunction was permissible, this one, prospective in operation and couched in the language of the contract, is improper. The court found that there have been seven work stoppages at Maple Creek within twelve months over disputes subject to resolution under the Settlement of Disputes procedures of the 1974 or 1971 agreements, and concluded that unless restrained by the court such breaches of the agreement would continue. No finding was made, however, that the likelihood of future breaches of contract was attributable to any specific activity or lack of activity on the part of the UMW, District 5, or the officers of the Local. Indeed, the court acknowledged that "[t]he principal complaint of the plaintiff is against the membership in the local union." 393 F.Supp. at 940. In Part III of this opinion we have indicated that the union defendants have a contractual duty to enforce the no-strike undertaking, and the employer is entitled to equitable relief to that end. But it is quite another matter to hold that the union defendants may be subjected to an injunction, with the attendant sanctions for contempt, drawn in the language of the contract and of indefinite duration.

The issue of prospective *Boys Markets* injunctive relief to remedy repeated breaches of the collective bargaining agreement is in this circuit one of first impression. Recently the Fifth Circuit overturned a decree framed as broadly as the arbitration clause. *United States Steel Corp. v. United Mine Workers of America,* 519 F.2d 1236 (5th Cir. 1975), *petition for cert. filed,* 44 U.S.L.W. 3626 (U.S. Apr. 26, 1976) (No. 75–1562). The court wrote that an injunction so framed went beyond what *Boys Markets* permitted, violated § 9 of the Norris-LaGuardia Act, and did not comply with Fed.R.Civ.P. Rule 65. *Id.* at 1245. The precise holding may be narrower, however, since the court also observed that the "memorial protest" which produced the work stoppage was not over a matter which could under the agreement be grieved and arbi-

trated. *Id.* at 1248. Moreover, the Fifth Circuit has in other contexts taken a more restrictive view of the availability of *Boys Markets* relief than has this court. Compare, e. g., *Amstar Corp. v. Amalgamated Meat Cutters,* 468 F.2d 1372 (5th Cir. 1972) with *Island Creek Coal Corp. v. United Mine Workers of America,* 507 F.2d 650 (3d Cir.), *cert. denied,* 423 U.S. 877, 96 S.Ct. 150, 46 L.Ed.2d 110, (1975); *NAPA Pittsburgh, Inc. v. Automotive Chauffeurs, Local 926,* 502 F.2d 321 (3d Cir.) (en banc), *cert. denied,* 419 U.S. 1049, 95 S.Ct. 625, 42 L.Ed.2d 644 (1974); Note, The Applicability of *Boys Markets* Injunctions to Refusals to Cross a Picket Line, 76 Colum.L.Rev. 113, 123–29 (1976). Nevertheless, Judge Wisdom's thorough analysis of the reasons why, assuming any injunction was appropriate, a prospective injunction drawn as broadly as the contract was improper, cannot be lightly regarded. He reasoned that the *Lincoln Mills-Boys Markets* exception to the Norris-LaGuardia Act's prohibition against federal injunctions in labor cases necessarily required an ad hoc adjudication whether the underlying dispute could be grieved and arbitrated under the contract. A prospective injunction in the language of the contract precluded such case-by-case analysis, except, perhaps, in contempt proceedings. Thus the injunction was necessarily broader, in proscribing activity, than *Boys Markets* permitted.

Judge Wisdom also pointed to the language in § 9 of the Norris-LaGuardia Act, which requires that

> "every . . . injunction granted in a case involving or growing out of a labor dispute shall include only a prohibition of such specific act or acts as may be expressly complained of in the bill of complaint or petition filed in such case . . . ." 29 U.S.C. § 109.

In another context we have held that § 301 does not wholly supplant the Norris-LaGuardia Act, but rather requires an accommodation between the policies of the earlier statute and the later. *United States Steel Corp. v. United Mine Workers of America,* 456 F.2d 483 (3d Cir.), *cert. denied,* 408 U.S.

923, 92 S.Ct. 2492, 33 L.Ed.2d 334 (1972). In that case the accommodation was between § 301 and § 7 of Norris-LaGuardia. The same accommodation, it seems to us, must be made between § 301 and § 9 of that Act. *See New York Telephone Co. v. Communications Workers of America,* 445 F.2d 39, 49–50 (2d Cir. 1971). It can hardly be gainsaid that in spirit if not literally § 9 proscribes a prospective injunction against breaches of contract that may not yet even be contemplated or that are unlikely to occur.

Finally, Judge Wisdom referred to the requirement in Rule 65(d), Fed.R.Civ.P.,[17] that every injunction be specific in terms and describe in reasonable detail the act or acts sought to be enjoined.. That rule requires that the order give fair warning of what conduct will be contemptuous. A cross reference to the arbitration clause, especially one as broad as that in the 1974 agreement, which contemplates arbitration over "differences . . . about matters not specifically mentioned in this Agreement" and "local trouble of any kind," hardly seems the kind of notice contemplated by the rule.

In cases dealing with the same collective bargaining agreement examined by Judge Wisdom in the *United States Steel* case, the Seventh Circuit in *Old Ben Coal Corp. v. Local 1487, UMW,* 500 F.2d 950 (7th Cir. 1974) (*Old Ben II*) and the Tenth Circuit in *CF&I Steel Corp. v. United Mine Workers of America,* 507 F.2d 170, 173–77 (10th Cir. 1974), have sustained prospective injunctions similar to the one entered in this case. In both cases the district court found that repeated breaches of contract had occurred and were likely to recur.

The Seventh Circuit had earlier warned the defendant Local 1487 that its unwillingness to accept the court's adjudication that it could not strike over arbitrable grievances might result in a broad prospective injunction. *Old Ben Coal Corp. v. Local 1487, UMW,* 457 F.2d 162, 168 (7th Cir. 1972) (*Old Ben I*). In *Old Ben II* it relied on *Boys Markets* and *Old Ben I* without discussing the limitations of the *Boys Markets* remedy, the applicability of § 9, or the requirements of Rule 65(d).

The Tenth Circuit in the *CF&I* case relied heavily on *NLRB v. Express Publishing Co.,* 312 U.S. 426, 436–37, 61 S.Ct. 693, 701, 85 L.Ed. 930, 937 (1941), in which the Supreme Court approved some injunctive relief calculated to prevent future violations of the law. But that case lends no support for a § 301 injunction, for it involves a suit by a governmental agency to enforce a statutory policy, in which injunctive relief is expressly authorized by statute. In contrast, a *Boys Markets* suit is a private contract action which is a narrow exception to a statutory prohibition against injunctive relief. *See generally United States Steel Corp. v. United Mine Workers of America, supra,* 519 F.2d at 1247 n. 21. The *CF&I* opinion, unlike *Old Ben II,* did address the applicability of § 9. Acknowledging that *Boys Markets* requires an accommodation with the Norris-LaGuardia Act, it finds one by holding that § 9 permits a prospective injunction where the complaint gives fair warning that past violations will be relied upon as a basis for an injunction against future violations. 507 F.2d at 176. With respect to the Rule 65(d) problem the *CF&I* court points out that the injunction was not merely couched in the language of the contract, as in *Old Ben II,* but was directed against strikes or picketing over disputes arising from employee suspensions, discharges, and work assignments, all of which specific types of disputes had in the past resulted in violations.

---

17. Fed.R.Civ.P. 65:

 (d) Form and Scope of Injunction or Restraining Order. Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

Thus the Fifth Circuit seems to suggest that no injunctive relief against future violations would be proper, the Tenth Circuit holds that a prospective injunction against specifically identified types of future violations which have in the past occurred is proper, and the Seventh Circuit holds that an injunction as broad as the contract is permitted. We think that a position somewhere between the extremes is appropriate. In arriving at our position we separate overbreadth considerations from notice-vagueness issues.[18]

### A. Overbreadth

■ The power of a federal court to decide the meaning of a labor agreement in a § 301 suit is clear. Once it has done so it should not be required to relitigate essentially the same issue in a slightly different context over and over again. If the plaintiff in a § 301 suit pleads and proves that the defendant, whether labor organization or employer, is engaging in a pattern of conduct which results in repeated and similar violations, nothing in § 9 of the Norris-LaGuardia Act, as we read it, prevents an injunction directed at such a course of conduct. The court that has once determined in an adversary proceeding the meaning of a contract must have the power to protect the parties and itself from the necessity for and burden of repeatedly adjudicating what often may be the identical issue. And while we agree with Judge Wisdom that the *Lincoln Mills-Boys Markets* exception to the Norris-LaGuardia Act requires ad hoc adjudication relating the violation to the contract, we do not agree that a remedial injunction may not encompass a pattern of ongoing activity. It is by no means clear that Judge Wisdom intended to suggest that injunctive relief is entirely unavailable against a chronic pattern of continuing mischief. If he did, however, we respectfully disagree.

■ On the other hand, the approach of the *Old Ben II* court, which from the fact of repeated violations of unspecified type justifies an injunction "framed from the language of the 1971 Agreement," 500 F.2d at 953, seems to us to go much further than the evidence in this case would warrant. Prospective injunctive relief should go as far as, but no farther than, the pattern of violations suggests is necessary. Before prospective injunctive relief is ordered the district court must, we think, make specific findings based on evidence in the record as to the types of violations which have occurred in the past and limit injunctive relief to the likelihood of their recurrence, or to new and different kinds of violations which may be expected to occur in the future. The court must, moreover, relate the likelihood of recurrence or occurrence to some act, omission or responsibility of each defendant against whom such injunctive relief is ordered. Neither step was taken in this case. Indeed, the court merely took judicial notice of the four prior lawsuits which arose under the 1971 agreement.

### B. Notice-vagueness

■ The absence of any factual nexus between the pattern of past violations and the breadth of the injunctive order serves to emphasize the unions' Rule 65(d) notice-vagueness objection. Nowhere does the injunction instruct the officers of the UMW or of District 5 what steps they should have taken with respect to the past violations and should now take to prevent their recurrence. We believe that Rule 65(d) requires that something more be done in this case. Obviously, the duties of the officers of the UMW and of District 5 with respect to carrying out the contract are not identical with those of the officers of the Local. But even those latter officers are not apprised in the district court order of what steps they should take to enforce the contractual obligations of the unruly membership. While we are inclined to agree with the *CF&I* court in defining the breadth of the

---

**18.** See Judge Wisdom's discussion of this distinction in *United States Steel,* 519 F.2d at 1246 n. 19.

prospective injunction, we do not think its analysis of the Rule 65(d) issue is sufficiently discriminating in the context of a labor organization having a multitiered organizational structure. It seems to us that any prospective injunctive decree must tell the local what specific steps it must take to prevent illegal work stoppages from recurring and must tell the parent organization what prophylactic steps it must take to assure that the local fulfills its contractual obligation. A blanket injunction in the language of the arbitration clause places in the hands of the successful § 301 plaintiff a weapon by which harassment by contempt citations may take the place of the normal ongoing collective bargaining process. No § 301 defendant should be subjected to that risk.[19]

 In summary, we agree with the district court that in a § 301 suit a federal court may enjoin prospectively a pattern of contract violations, but we hold that in this instance the injunction was both overbroad and insufficiently specific. This holding requires a reversal and remand. But since there will be further proceedings in the district court we address the unions' remaining objections to the injunction.

## V. The absence of an order compelling the employer to arbitrate

 The Supreme Court has indicated that a *Boys Markets* injunction should contain an order directing the plaintiff to arbitrate the underlying dispute "as a condition of his obtaining an injunction against the strike."[20] The instant order contains no such condition. It is clear from the pleadings below, however, that the willingness of United States Steel to grieve and arbitrate the three February 1975 disputes was never in dispute.[21] Moreover, the district court itself rather than counsel for the plaintiff appears to have drafted the form of order, and the defendants did not call this deficiency to the court's attention. Under these circumstances we would be inclined not to consider the objection on appeal, at least insofar as the injunction deals with the duty to arbitrate the February 1975 disputes. The issuance of a prospective injunction, however, puts the issue of the plaintiff's correlative duty to arbitrate in sharp focus. If an injunction, and thus the sanction of contempt, is to be available to an employer against future work stoppages, it must also be conditioned upon the employer's continued willingness to comply in good faith with the settlement of disputes

---

**19.** We judicially notice that the UMW, District 5 and the Local have been held on at least one occasion to be in civil contempt of Judge Rosenberg's March 13 order granting preliminary injunctive relief. *See United States Steel Corp. v. United Mine Workers of America*, 393 F.Supp. 942 (W.D.Pa.1975). On April 21, 1975 employees at Maple Creek Mines Nos. 1 and 2 refused to work in protest against the suspension of 5 co-workers. In holding the union in civil contempt the district court observed that

"Neither the International Union nor District 5 have taken any action to discipline any members of Local Union No. 1248 for their conduct in connection with the illegal work stoppage nor have they taken any steps to suspend the atonomy [sic] of Local Union No. 1248 as permitted under Articles XV and XVIII of the Constitution of the International Union, United Mine Workers of America." *Id.* at 945.

The citation accentuates the deficiency of the March 13 injunctive order. As previously noted, it does not even generally specify what kinds of disciplinary measures—*e. g.*, fines, forfeiture of privileges, expulsion—the UMW and

District 5 can and should take to discharge their contractually-implied all reasonable efforts obligation. The March 13 order puts union officials to the task of selecting, upon pain of contempt for error of judgment, what remedial steps are most appropriate in the circumstances. *See generally* 89 Harv.L.Rev. 601, 607–09 (1976). As indicated in Part III of this opinion, the unions can be enjoined for their failure to comply with their contractual duties. But before sanctions can be levied for disobedience of an injunctive decree, the unions must be adequately forewarned that certain acts by the membership and certain acts and/or omissions of union officials may expose them to contempt. The March 13 order fails to do this.

**20.** *Boys Markets, Inc. v. Retail Clerks, Local 770, supra*, 398 U.S. at 254, 90 S.Ct. at 1594, 26 L.Ed.2d at 212, quoting *Sinclair Refining Co. v. Atkinson*, 370 U.S. 195, 228, 82 S.Ct. 1328, 1346, 8 L.Ed.2d 440, 460 (1962) (Brennan, J., dissenting).

**21.** The district court so found. Finding of Fact 27 (239a).

provisions of the contract. In *Roofing & Sheet Metal Contractors' Association v. Sheet Metal Workers' International*, 529 F.2d 512 (3d Cir. 1975) (per curiam), we held that an injunction against a specific work stoppage must contain an order to arbitrate. If the court orders a prospective injunction such as United States Steel here seeks, it should include an order directing compliance with the settlement of disputes clause at least as broad, and for the same period, as the injunction.

## VI. The likelihood of irreparable injury

 The district court's findings of fact with respect to the irreparability of the injury which would occur to United States Steel from shutdown of its Maple Creek complex, and the consequent interruption of steel production at other plants dependent on metallurgical coal from that complex are not clearly erroneous.

## Conclusion

The order appealed from will be vacated and the cases remanded to the district court for further proceedings consistent with this opinion.

ROSENN, Circuit Judge (concurring).

I join in Parts I, II, V, and VI of Judge Gibbons' opinion. I take a somewhat different approach, however, to the basis of union liability, Part III, and to the scope of the injunction, Part IV.

### A. Union Liability

In my view, the liabilities imposed on the union by the contractual theory of an implied best efforts promise, and the liabilities imposed under the mass action theory, must be more carefully distinguished. Also, I believe that distinctions in duties and liabil-

ities of the local, district, and international unions must be recognized.

### 1. Contractual Theory

 I might, in other circumstances, agree with Judge Gibbons that a best efforts promise can be implied from an already implied no-strike clause. I do not believe, however, that this case presents us with that problem, and I would not reach it. In light of the case law and the contractual language, I would rest our holding solely on the explicit language of Article XXVII of the 1974 collective bargaining agreement.

In *Eazor Express, Inc. v. International Brotherhood of Teamsters*, 520 F.2d 951 (3d Cir. 1975), *cert. denied*, 424 U.S. 935, 96 S.Ct. 1149, 47 L.Ed.2d 342, 44 U.S.L.W. 346 (1976), Judge Maris restated the basic principle that

> the courts may not remake the parties' contracts and may declare an implied obligation to exist only when there is a satisfactory basis in the express provisions of the agreements which make it necessary to imply certain duties and obligations in order to effectuate the purposes of the parties.

*Id.* at 960. He rested his opinion in part on the presence of an express no-strike clause in the National Master Freight Agreement.[1]

The contract here does not contain an explicit no-strike clause, but the unions did agree in Article XXVII to "maintain the integrity of the contract" and to settle "all disputes and claims which are not settled by agreement . . . by the machinery provided in the 'Settlement of Disputes' Article." As Judge Maris stated in *Eazor*, a collective bargaining agreement imposes "continuing day-to-day obligations on the parties to fulfill their terms in good faith." 520 F.2d at 959. The unions' promises here

---

1. I agree with Judge Gibbons that Judge Maris' treatment of *United Construction Workers v. Haislip Baking Co.*, 223 F.2d 872 (4th Cir.), *cert. denied* 350 U.S. 847, 76 S.Ct. 87, 100 L.Ed. 754 (1955), should be read only as distinction of inapposite precedent. And, in any event, *Haislip* is not controlling authority in this circuit.

In addition, *see Penn Packing Co., Inc. v. Amalgamated Meat Cutters, Local 195*, 497 F.2d 888, 891 (3d Cir. 1974). The collective bargaining agreement in *Penn Packing* had much more explicit language than the agreements in either *Eazor* or this case. However, the employer's claim there was for indemnity and thus the language of that opinion is not controlling here.

would be vacuous without a good faith effort to ensure that disputes are settled by the grievance machinery of the agreement. What that effort is will vary with the circumstances, but in the context of an unauthorized strike, substance can be given to those promises only by the union officers' taking all reasonable measures to move the dispute from the battlefield of economic warfare to the green table of the grievance and arbitration process.[2]

That is not to say that the similar promises of the local, district, and international unions impose identical duties on each. To be sure, each has the duty to take all reasonable steps necessary to end the unauthorized strike and commit the dispute to the grievance process, but what is reasonable will depend on the circumstances of each union—its relationship to the strikers and its ability to exercise control and direction over them. This is a factual inquiry that, in an injunction proceeding, the district court must undertake.

## 2. The Mass Action Theory

Although seemingly an independent theory of liability, the mass action theory, as I understand it, does not impose liability independent of the collective bargaining agreement. When a union has a contractually imposed obligation not to strike—either express or implied—and substantially all the members of the union act concertedly in violation of that obligation, the breach of contractual duty is imputed to the union as an entity. Liability under this theory is thus predicated on the contract.

The premise underlying the imposition of liability is, as stated by Judge Maris, that

"large groups of men do not act collectively without leadership." *Eazor, supra,* 520 F.2d at 963. As I read this premise, the mass action theory presumes that some union members (not necessarily elected officers) have led the strike—that is, planned it or urged union members to strike—*before the strike in fact occurs.* This presumptive ab initio sanctioning of the strike is imputed, by this theory, to the union as an entity.

Thus seen, the mass action theory differs from the contractual theory. The mass action theory imposes liability on the union for actions taken by the membership as a whole before or at the inception of the strike. The contractual theory imposes liability for actions or omissions of union officers after the strike occurs.

I think this difference is significant. If the union has no complicity in causing the strike, the most that can reasonably be expected of it is to take all reasonable efforts to end the strike. If, however, the union membership has carried out the strike from its inception, as the mass action theory presumes, union liability arises at the time the strike occurs. While good faith efforts thereafter to end the strike may mitigate union liability, it cannot completely escape the consequence of the initial wrongful act of its membership.[3]

To be consistent with the theory, however, liability must be limited to the entity, the mass [4] of whose membership acts in concert. This is because the theory presumes that the leadership for the mass action comes from within the group that generates the unlawful action. Thus, in most cases, it will be only the local on which liability is imposed under this theory.

---

**2.** For this reason, I disagree with Chief Judge Seitz and I believe that the international and district officers are proper parties to a preliminary injunction under this theory especially since the international union is the principal union party to the collective bargaining agreement.

**3.** As a matter of policy, I believe it is appropriate to impose responsibility on the local union for the consequences of the acts of its membership who assume the benefits of a collective bargaining agreement but then disregard its

obligations. Therefore, I cannot agree with Judge Gibbons' statement that "irrespective of the theory upon which union liability for unauthorized strikes is premised, the court must inquire into the reasonableness of the attempts by local and parent union officials to avert or halt wildcat activity by the membership."

**4.** The prerequisite for the application of the mass action theory, as I see it, is that substantially all of the members of an entity act in concert.

There can conceivably also be district and international union liability if there is evidence to show complicity by officers of these entities directly or indirectly in the mass action.[5]

### 3. Remedy

Accordingly, in the case sub judice, I would hold that injunctive relief is available against the local union irrespective of any efforts made by its officials to end the strikes once they had begun. I would further hold that an injunction may run against the district and international unions, but only because they did not exercise all reasonable efforts to end the strike.[6]

### B. Scope of the Injunction

In accordance with my discussion of the liability of the various unions, *supra*, I believe that any injunction in this kind of case must differentiate in the duties it imposes on the local, district, and international unions. The primary purpose of the injunction, of course, is to terminate the unauthorized strike of the local union members.

Since generally it is the local union members who are striking, the no-strike prohibition will run primarily against them. As previously discussed, the liability of the district and international union will arise, in most instances, from their failure to take all reasonable efforts to end an unauthorized strike. Thus, as I see it, they will be subject to a mandatory injunction: they will be ordered to take affirmative action to end the present strike and to prevent a future strike from occurring or continuing.

### 1. Overbreadth

I do not read Judge Gibbons' opinion as denying the power of a district court to issue an injunction framed in the language of the arbitration clause of a collective bargaining agreement, broadly prohibiting strikes over any arbitrable grievance, where the facts before the court justify such an injunction.[7] I understand Judge Gibbons to state only that the broad injunction here was not warranted by the evidence before the district court.[8] In view of the district court's failure to make findings as to the nature of previous violations in the cases of

5. I perceive on the record in the instant case no such participation by the district or international unions.

6. Under my analysis of the contractual best efforts theory, the district court would ordinarily be expected to make findings as to whether efforts made by a parent union to end a strike were reasonable in light of the degree of control that parent had over the local, before subjecting the parent to an injunction. In the instant case, the district and international merely sent a telegram urging the end of one strike, and took no action on the other two strikes. In my view, these actions cannot in any circumstances be the best reasonable efforts of a responsible party to a collective bargaining agreement.

7. In my opinion, such an injunction would be justified where it is shown that the union has continually and repeatedly disregarded the grievance and arbitration provisions of the collective bargaining agreement and that a more narrowly drawn decree would not protect the employer. (E. g., where a union has engaged in numerous wildcat strikes over arbitrable grievances of such a wide variety that they cannot be effectively categorized, as the court did in *CF&I Steel Corp. v. United Mine Workers of America*, 507 F.2d 170, 173 (10th Cir. 1974), it

would be impossible to write a narrow injunction.) With due respect to Judge Wisdom's opinion in *United States Steel Corp. v. United Mine Workers of America*, 519 F.2d 1236 (5th Cir. 1975), I do not read *Boys Markets* to preclude such an injunction; the Supreme Court simply did not have a fact pattern as I describe above before it. The reasons Judge Gibbons sets out on p. 1077 of his opinion persuade me that in such a factual context, a broad injunction can be necessary to accomplish "the purpose of *Boys Markets* [—the vindication of] the arbitral process." *United States Steel Corp. v. United Mine Workers of America, supra*, 519 F.2d at 1243. Furthermore, I do not believe that a broad injunction in response to a pattern of contractual violations conflicts with the purposes of the Norris-LaGuardia Act. *See Boys Markets, supra*, 398 U.S. at 253, n.22, 90 S.Ct. at 1593, 26 L.Ed.2d at 211.

8. Judge Gibbons states that "the approach of the *Old Ben II* court, which from the fact of repeated violations of unspecified type justifies an injunction 'framed from the language of the 1971 Agreement,' . . . seems to us to go much farther than the evidence in this case would warrant."

which he took judicial notice, and for the reasons stated below, I agree with that conclusion.

The complaint and the evidence before the district court related only to three specific strikes over arbitrable grievances. The court then took judicial notice that "[w]ithin the past twelve months, there have been seven work stoppages at the Maple Creek Mine, including the three stoppages in February 1975 over disputes subject to resolution under the Settlement of Disputes procedure of the present and previous labor agreement." He further notices that there was litigation over each of these previous disputes. I think it is proper for a district judge to take judicial notice of record evidence in other cases and decisions of other district courts relating to previous contractual violations of the parties before him. However, more than simply noting their existence is required.

I agree with Judge Gibbons that before prospective injunctive relief is ordered, the district court must find from the evidence before it that violations that have occurred are likely to recur, or that the pattern of past violations indicates that different violations will occur.[9] The prospective part of the injunction should then be directed to prohibiting the recurrence of such potential future violations.[10]

Some concrete examples may clarify this necessarily abstract language. If the district court finds that strikes have occurred and likely will occur over two types of arbitrable grievances, e. g., employee suspensions and vacation pay, the injunction can be limited to enjoining future strikes over only these categories of grievances. If, however, the district court finds a proclivity to strike over every arbitrable grievance, it may conclude that the grounds for future strikes cannot be adequately forecast and it appropriately may issue a broad injunction.

The district court here did not undertake a sufficient examination of the union's past conduct. It merely noticed the four previous strikes without, as far as the record before us indicates, examining the grievances giving rise to those strikes. It drew no conclusions as to what types of future violations the union's past conduct indicated would likely recur. The district court gave no consideration to whether an injunction narrower in scope than the one it issued would have afforded sufficient relief.

In addition, the injunction did not differentiate among the duties imposed on the local, district, and international unions.

I thus agree that the injunction must be vacated and the case remanded.

### 2. Notice-Vagueness

I agree with Judge Gibbons that insofar as the injunction orders the district and international unions to take all reasonable efforts to prevent or end a future strike, the decree must specify what efforts the court expects from these unions. I also agree that insofar as officers of the local are to be held personally responsible for compliance with the injunction, it must specify what steps they must take to prevent or end a strike. Without such specification, the unions and their officers would, in the event of a subsequent contempt proceeding, be subject to the district judge's post hoc evaluation of the sufficiency of their efforts. What steps the court requires of the parent unions will depend on the court's analysis of the relation of the district and international to the local and their control over the local.

However, efforts of local officers cannot relieve the local from liability as an entity. If the injunction restrains the local union from striking over specific arbitrable grievances and it does strike in violation of the decree, it is in contempt at that point, and the efforts of its officers to avert or settle

---

**9.** I do not join Judge Gibbons' statement that the court must "relate the likelihood of recurrence or occurrence to some act, omission, or responsibility of each defendant against whom such injunctive relief is ordered."

**10.** Parent unions would be ordered to take all reasonable efforts to terminate strikes that fall within the prohibition.

that strike do not change the fact of the contempt.

A more difficult problem is whether the language describing the grievance over which striking is prohibited, is sufficiently specific to meet the requirements of Rule 65(d). Specificity in this context is a problem of the inevitable imprecision of language attempting to deal with a fact situation still to unfold.[11] If a district court finds that future strikes will occur over a narrow class of grievances, it can easily frame a very specific injunction. The broader the range of past union violations, the more difficult it becomes to frame specific prohibitions of future conduct which will provide relief not readily frustrated by strike-happy persons.

Rule 65(d) requires only that acts restrained be described "in reasonable detail." It leaves ample opportunity for the application of common sense standards. As with other reasonableness standards, compliance with Rule 65(d) can be examined only on a case by case basis. We can only offer district courts some general guidance.

A union should not be allowed to escape injunctive restraints merely because the range of previous violations by its members defies categorization. The injunction "should be broad enough to prevent evasion." *Local 167 v. United States*, 291 U.S. 293, 299, 54 S.Ct. 396, 399, 78 L.Ed. 804, 810 (1934), *cited with approval in May Stores Co. v. Labor Board*, 326 U.S. 376, 391 n.13, 66 S.Ct. 203, 212, 90 L.Ed. 145, 157 (1945). When past violations may be reasonably categorized, the order should do so. *See CF&I, supra*, 507 F.2d at 173. When, however, the pattern of past conduct does not readily lend itself to such treatment, I see no objection to the use of carefully considered language broadly restraining strikes over arbitrable grievances, especially if it

can be joined with specific language, to provide effective relief. *See May Stores Co. v. Labor Board*, 326 U.S. at 391, 66 S.Ct. at 212, 90 L.Ed. at 157.

Inevitably, there will be areas of doubt. This problem, however, should be minimal. Even where the injunction broadly prohibits strikes over any arbitrable grievance, arbitrability of grievances growing out of working conditions will seldom be in doubt in today's labor law. Where such doubt arises, the union can readily seek declaratory relief from the court before striking. *See Old Ben Coal Corp. v. Local Union No. 1487 of United Mine Workers*, 500 F.2d 950, 953-4 (7th Cir. 1974).[12]

Since I agree with Judge Gibbons that the injunction in this case must be vacated and the case remanded for further findings, I have no need to evaluate the specificity of this order.

### C. Conclusion

To recapitulate my view, on this record injunctive relief is available under the mass action theory only against the local union. Injunctive relief against the district and international unions may be granted because they did not exercise all reasonable efforts to terminate the strike. The district court, however, failed to make the necessary examination of previous violations and to find that similar or other violations are likely to recur. Although my approach differs from Judge Gibbons in certain aspects, I agree with him that the injunction must be vacated and the case remanded for further findings.

SEITZ, Chief Judge (concurring and dissenting).

I agree with Judge Gibbons that under the 1974 Agreement the grievances here

---

11. For example, is a strike over a layoff in violation of a decree forbidding strikes "over disputes arising from employee suspensions, employee discharges and work assignments . . ."? *CF&I, supra*, 507 F.2d at 173.

12. Where a broad prospective injunction has been issued and there is doubt whether it prohibits a strike over a grievance, the union, if it wants to minimize the risk of contempt, will have to refrain from striking while litigating the arbitrability of the grievance. That result is not unfair, in my view, where the record shows the type of consistent violation of a collective bargaining agreement necessary for the issuance of the broad injunction.

involved were subject to arbitration and that, in consequence, a *Boys Market* preliminary injunction of proper scope would have been warranted against the local union.

However, I am unable to agree that a preliminary injunction should have been issued against the district and international unions. The district court was presented with evidence that the local union was engaging in work stoppages violative of the collective bargaining agreement. However, the plaintiff offered no evidence whatsoever indicating that the district or international unions had ordered, approved or even condoned the actions of the local. As the district court itself stated:

> "The evidence presented before me up until now relates only to the procurement of a preliminary injunction to compel members of Local 1248 to continue their employment in the mine in spite of any grievances or complaints which are susceptible to the grievance machinery." 393 F.Supp. at 940.

Consequently, on the evidence before the district court, a preliminary injunction restraining the local union was all that was necessary to preserve the status quo pending the final resolution of the controversy. Whether the district or international unions should ultimately share responsibility for the local's actions, and thus be included in any final order, is an issue which should be resolved after a full hearing on the merits.

Nor do I believe that a district court may enter an order at the preliminary injunction stage prospectively enjoining work stoppages over disputes other than those specifically before it. The function of a preliminary injunction is to preserve the true status quo. That principle is violated by a preliminary injunction which, in essence, adjudicates other disputes and future grievances. Moreover, strict adherence to this principle is especially important in the labor injunction context where the powers of the federal courts have been severely circumscribed

by the Norris-LaGuardia Act. Consequently, in my opinion the district court should have restricted the scope of its preliminary injunction to include only those work stoppages over disputes which if found arbitrable under the collective bargaining agreement in question.

Although I believe that a rather broad prospective decree such as that mandated by Judge Gibbons is inappropriate in the preliminary stage of a proceeding, I express no opinion as to whether Section 9 of the Norris-LaGuardia Act precludes a federal court from permanently enjoining a pattern of conduct which results in repeated and similar violations of a collective bargaining agreement after a final adjudication on the merits.

Finally, I agree with Judge Gibbons that any injunction entered should include an order directing United States Steel to arbitrate. Any *Boys Market* injunction must necessarily contain such an order since the duty to arbitrate constitutes the quid pro quo for the union's no-strike pledge.

Before SEITZ, Chief Judge, and VAN DUSEN, ALDISERT, ADAMS, GIBBONS, ROSENN, HUNTER, WEIS and GARTH, Circuit Judges.

## OPINION SUR PETITION FOR REHEARING IN BANC

PER CURIAM.

▮ We have before us a petition by the defendant unions for rehearing in banc. The issues involved in this case are exceptionally important and controversial. On some of them the panel members divided three ways, and the several courts of appeals which have considered these issues have divided at least three ways as well.[1] Clearly, the subject matter is such that in banc consideration ordinarily would be appropriate. Whatever this court sitting in banc decided, however, the difference among the circuits would remain with re-

1. *See, e. g., United States Steel Corp. v. United Mine Workers of America*, 519 F.2d 1236 (5th Cir. 1975), *petition for cert. filed*, 44 U.S.L.W. 3626 (U.S. April 26, 1976) (No. 75–1562); *CF&I Steel Corp. v. United Mine Workers of America*, 507 F.2d 170 (10th Cir. 1974); *Old Ben Coal Corp. v. Local 1487, UMW*, 500 F.2d 950 (7th Cir. 1974).

spect to the application of the federal law of labor arbitration to the same national labor contract. Only the Supreme Court is in position to resolve this conflict. A petition for certiorari has already been filed seeking review of the decision of the Fifth Circuit in *United States Steel Corp. v. United Mine Workers of America,* 519 F.2d 1236 (5th Cir. 1975), *petition for cert. filed,* 44 U.S.L.W. 3626 (U.S. April 26, 1976) (No. 75–1562). If certiorari should be granted in that case, the Supreme Court should be in a position to simultaneously consider this case involving the same collective bargaining agreement. Rehearing in banc might prevent and certainly would delay such consideration. The issue of injunctive relief with respect to future violations of implied no strike agreements is of such importance that we prefer to take no step that might delay a petition for certiorari.

The petition for rehearing in banc will be denied.